# CASES

---

### CALDWELL *versus* THE STATE.

The State of Alabama has the undoubted constitutional right to extend its civil and criminal jurisdiction, over any tract of Indian country within her limits, where the Indian title is not extinguished.

The statute of 1829, extending the jurisdiction of the State of Alabama over the Creek nation, was not in violation of the Constitution of this State, or of tne United States; nor of any act of Congress passed in compliance with the latter; or of any treaty made in pursuance thereof.

An offence committed in the Indian territory, to which the Indian title has not been extinguished, but over which territory the jurisdiction of the State Courts has been extended, is properly cognizable in the Courts of this State, and the conviction of one for felony on such lands, held legal.

This important cause arose on the conviction of Caldwell for the murder of a Creek Indian. The crime was committed on the lands of the Creek nation, the Indian title to which had not, at the time of the commission of the offence, been extinguished. In the year 1829,[*] an act of the legislature of Alabama became a law, extending the jurisdiction of the State over the Creek nation; and in a correspond-

---

[*] See Aikin's Digest, page 293, sec. 6.

ing extension of the criminal jurisdiction of the Circuit Court of Shelby, this conviction was had.

The Circuit Court reserved the case for the consideration of this Court; and the points raised here, were as to the right of the State of Alabama to enact the statute in question.

It was insisted in error, that the act was in direct violation of the Constitution of the United States, and of the Treaties made with the Indian tribes. That the aggression was alone cognizable in the Federal Court, and that the State Court had no jurisdiction or control of the offence.

The great legal learning displayed in the decision of this question, and the important constitutional principles investigated by the Bench, cannot fail to render it an important document in the judicial history of the State; and especially interesting, as deciding a question, the political aspect of which has so long disturbed the country, and created such diversity of opinion.

*Gordon* and *Shortridge* for appellants.
*Bagby, contra.*

LIPSCOMB, C. J.—It is with the most unfeigned diffidence of my own abilities, that I approach the interesting question presented in this case; not only on account of its intrinsic importance, but because it has employed the learning and talents of the most able and distinguished men of our country, without producing unanimity of public opinion. When such efforts have failed, I may well despair. As however it has been made my duty, I shall express such views on the subject, as have been satisfactory to my mind,

however erroneous and unsound, they may appear, to those for whom, I entertain the most profound respect.

I must beg leave to protest against the manner in which the subject has been generally treated in the forum, in the pulpit, and in the numerous newspaper essays, with which Philanthropy, has so liberally sought to instruct us in morals and the true science of government. The question is, not whether the Indian shall be consigned over, stripped of every right "that humanity is heir to," to be a subject of the most heartless, unrestrained, and diabolical despotism—that he is to be free and independent of all civil institutions, or hunted down as the beast of the forest, and made the property of the first captor. These consequences, have been conjured up by the overheated imaginations, of there, who deny the right of the States, to exercise jurisdiction over the Indians, but have no foundation in truth. If the Indian, is subjected to our laws, whilst in the chartered limits of the State, these laws, are also held over him as a shield of protection, not only against assaults on his rights, from his fellow Indian, but, against the lawless encroachments of the white man. Of this fact, there needs no stronger illustration, than the conviction we are now called on to review.

A white man is now under sentence of death for the murder of a Creek Indian, within the limits of this State, but on the territory occupied by the Creek Indians, and must expiate his crime by an ignominious death, unless we reverse the sentence awarded by the Circuit Court, on the ground of a want of jurisdiction.

It is contended, that the act of the Legislature of

Alabama, extending the jurisdiction of the State, and embracing that part of the Creek Nation where the offence was committed in the county of Shelby is void, because it is in contravention of that provision in the Constitution of the United States, that confers on Congress, the right, to regulate commerce with foreign nations, and among the several States, and with the Indian tribes. If the argument of counsel, was correctly understood, it was urged that the power to regulate trade and commerce, confers plenary powers on the General Government, to legislate and exercise jurisdiction, over the Indians, of the several tribes, within the several States, in exclusion of the local or State jurisdictions. Were it admitted that the Indian tribes embraced within the limits of a State, are referred to, in this grant of power to the General Government, it would not necessarily follow, that the principle contended for is correct.

There is nothing in the exercise of State jurisdiction incompatible, with the right of the General Government to regulate trade and commerce—each jurisdiction can be sustained, whilst operating within its legitimate sphere. It is not competent for a State to exercise a jurisdiction, conceded to the General Government. But she may exercise all the powers of a sovereign independent State, within her own limits, if those powers have not been relinquished. The General Government is one of limited powers, and can exercise no sort of jurisdiction not conceded to it, by the Constitution. All the powers of sovereignty not conceded, remain with the states. Although the states may not be authorised to pass laws regulating trade and commerce, they may well take cognizance of murder, of larceny, and enforce con-

tracts not in contravention of such regulations of trade and commerce, as may be ordained by Congress. The plenary jurisdiction of the United States cannot extend beyond the subject of the grant to Congress. Trade and commerce have been subjected to its control, and to exercise it further would be destructive of all those salutary barriers, interposed for the protection of the states from federal encroachment. Admit the principle contended for, and the whole action of state jurisdiction would be arrested and subverted; for the terms used in the grant of power, refer as clearly to the states, as to the Indian tribes. This view, is on the hypothesis, that the tribes within the limits of a state are embraced by the Constitution; but its truth may well be controverted. Surrounded as our government was, at the period of the adoption of the Constitution, by numerous and barbarous tribes of Indians, not within our territorial limits, it is not to be supposed, that the power to regulate trade and commerce with them, would have been deemed too unimportant for the consideration of the framers of that instrument. The Indian tribes, were a description of people, not coming within any known definition of an independent sovereign nation or government; hence, they could not be embraced in the term, foreign nation. The term did not express the familiar idea entertained of those people; it was therefore essential to employ the more expressive one, Indian tribes. In connexion with this view of the subject, it is worthy of consideration, as a historical fact in federal jurisdiction, that it never has been assumed over the small tribes, within the limits of a state. I will leave it to others to determine, what is the standard of depreciation to which a tribe

must be reduced, to fall below federal jurisdiction. Another position assumed, in support of federal jurisdiction is, that the ultimate right of soil is in the United States, and that jurisdiction follows that right as its incident: this argument is novel and unsound. The United, States has never rested its right of jurisdiction, over her Forts, Arsenals and Dockyards, on her right of soil; but has always applied to the state, for a relinquishment of jurisdiction. Chancellor *Kent* says, "that if the United States had been in "constant possession of a place as a Fort, from the "first organization of the government, but had not "obtained a cession of jurisdiction from the state, "the jurisdiction remains with the state."[a]

[a] 1 Com. 404

Another ground assumed, is alike destructive of federal and state jurisdiction. It claims for the Creek tribe of Indians, the high character of independent sovereignty, entitled as such, to every political right incidental thereto. The Indians, it is said, were the first occupants of the soil; and the first European discoverors, acquired no right, except such as the Indians conceded to them. That possession acquired by force, conferred no right, as it was in violation of the paramount natural right of the original occupants. We will examine this high pretension to savage sovereignty. If a people are found in the possession of a territory, in the practice of the arts of civilization; employed in the cultivation of the soil, and with an organized government, no matter what may be its form, they form an independent community; their rights should be respected, and their territorial limits not encroached on. From such a people, territory can only be acquired consistently with good faith, and national law, peaceably by treaty; by con-

quest, in open war; or by a forcible trespass, in violation of political right. The first mode of acquisition, would be in accordance with the soundest principles of morality; the second, sanctioned by the uniform usages of war ; the last would be morally wrong ; and if the power whose rights had been invaded, was too feeble to extort redress, other governments would be justified in making common cause in enforcing right against the wrong doer. But if the usurpation was acquiesced in, the political aspect of such an acquisition would be in favor of the *jus possessionis.* The code of national law, by which political societies should be tried, to establish their national rank, is not one of express enactment ; nor the result of any convention of assembled nations: but it is a system of elementary principles, to which, the influence of morality and propriety, has constrained all civilized nations, tacitly to yield their assent ; and is now considered as binding and obligatory as if sanctioned by the most solemn treaties. Savage tribes without a written language, or established form of government, and wholly ignorant of the customs and usages of civil society, are not capable of appreciating the principles of this code; and, (not yielding obedience to its canons,) have never been looked on as parties to this compact of nations.

Were the natives of this vast continent, at the period of the advent of the first Europeans, in the possession and enjoyment of those attributes of sovereignty, to entitle them to take rank in the family of independent governments ? They were composed of numerous tribes, subsisting by fishing and hunting, without any uniform or established system of government. Whatever authority exercised was adventi-

tious and temporary, passing from one warrior to another, as accident might determine ; and what was essential to national character, they had no geographical boundaries : under such circumstances the continent is discovered by the Europeans. What ought they to have done? The fairest quarter of the globe is roamed over by the wildman, who has no permanent abiding place, but moves from camp to camp, as the pursuit of game may lead him. He knows not the value of any of the comforts of civilized life : he claims no definite boundary of territory. In what way is he to be treated with? As well might a treaty, on terms of equality, be attempted with the beast of the same forest that he inhabits. If it were possible to treat with them, and a hunting camp should be purchased, the right of purchase would not extend beyond its confines : another tribe, or the same, might settle down at the immediate door of the purchaser. The Indians, until long after the first Europeans came among them, had no idea of any actual or ideal line of demarcation, between their several tribes. Tecumseh, in his celebrated speech, declares this, and complains that boundaries between the several tribes, were the result of arbitrary European imposition ; and this very tribe, that now assumes to be a sovereign, independent nation, within three quarters of a century back, claimed no territory beyond the smoke of the wig-wams; and how near them their neighbors, the Choctaws, might approach in their hunting expeditions was dependent on the relative strength of the two parties. Long continued wars had been waged between these tribes—their battle ground was wherever they chanced to meet—until the humanity of the British government inter-

posed, (not as one friendly neutral sovereign between two belligerents) but it was as sovereign to his subjects, the King of England, by his agent, Col. Stewart, spoke on Indian Affairs. He calls himself their great father, and informs the assembled Creeks and Choctaws, that he had resolved to put an end to those bloody rencontres; that he would, in order to effect this object, mark out a line, running North and South between them—that the Creeks ˏshould not hunt West of that line, nor the Choctaws East of it. Never was there loftier, and more absolute language of command used by a Roman pro-consul, to an abject, subjugated province, than that employed by this representative of the British Crown to the Choctaws and Creeks. The line designated by him, was the first boundary line known between two tribes, then among the most numerous and warlike in North-America.[a]

The civilized nations of Europe, had either to adjust among themselves, a fair, an equitable mode of acquisition, according to their own canons of morality and national law, or to leave this fair continent in the rude and savage state in which they found it. They reasoned, and reasoned correctly, that the right of the agriculturists was paramount to that of the hunter tribes.

The learned *Vattel* says, " the cultivation of the soil is not only to be recommended by government,

---

[a] I was present at a treaty held with the Choctaws, in October 1816, & heard the facts of Col. Stuart's ordering the Creeks and Choctaws to cease from hostilities, and his annunciation to them, of his determination to run a line of demarkation between the two tribes, testified to by respectable witnesses, who heard the orders when delivered by the British agent, and they also testified to the running of this line, and of its being the first ever known between them.

on account of the extraordinary advantages that flow from it, but from its being an obligation imposed by nature on mankind ; the whole earth is appointed for the nourishment of its inhabitants, but it would be incapable of doing it, was it uncultivated."

The same author again says, " It has has been asked, if a nation may lawfully take possession of a part of a vast continent, in which there are found none but erratic nations, incapable by the smallness of their numbers to people the whole ? We have already observed, in establishing the obligation to cultivate the earth, that those nations can not exclusively appropriate to themselves more land than they have occasion for, and which they are unable to settle and cultivate. Their removing their habitations through those immense regions, can not be taken for a true and legal possession ; and the people of Europe, too closely pent up, finding land in which these nations are in no particular want, and of which they make no actual and constant use, may lawfully possess it and establish colonies there."

The same author again says, " If each nation had resolved from the beginning, to appropriate to itself a vast country, that the people might live only by fishing, hunting and wild fruits, our globe would not be sufficient to maintain a tenth of its present inhabitants."

The European powers acted on these principles: they found the country uncultivated, and inhabited by only hunter tribes. Their own dominions were surcharged with population, and they appropriated a part of the uncultivated land of this continent to their own use, as well as they might do. If treaties were held with the nations, we have seen that more could not be

acquired by them than the savages actually occupied. Those treaties were no admissions of the Indians' right to the lands over which they occasionally wandered, in search of game or wild fruits. They were holden for the purpose of conciliating the savages, and was no more an acknowledgment of their right than the contribution levied by the Barbary cruisers, from many of the Christian powers. They were never considered by the Europians, as independent sovereignties : they adjusted the boundaries of their different clans on this continent, without consulting the Indian tribes that might be included in these boundaries

The present boundary line between the United States and the Republic of Mexico, was defined by treaty between the King of Spain and our government; and although it intersects many powerful and warlike tribes, no regard whatever is paid to them. It is the same as to the line between the American possessions of the Emperor of Russia and the United States. The United States have never, for a moment, lost sight of this right of jurisdiction, so far as to exclude foreign interference with the Indians within her limits.

At the Treaty of Ghent, an abortive effort was made by the British Commissioners, to have those Indians who had taken part with them, and who resided within the limits of the United States, included. Mr. Adams, the Secretary of State, in his instructions to Messrs. Gallatin and Rush, of 28th July, 1818, charges them, "not to concede any thing that would authorise the British to trade with the Indians within the limits of the United States."

About the commencement of Mr. Monroe's administration, in a Report made by Mr. Calhoun, then Secretary of War, on Indian Relations, he says, that we should determine what line of policy would be best to be pursued towards the Indian tribes, as most conducive to their improvement, without consulting them—or language of this import.

In the case of *Johnson* vs. *McIntosh*, Chief-Justice *Marshall* says, " the United States maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest, and gave them also a right to such a degree of sovereignty as the circumstances of the people would allow them to exercise." This is placing the tribes in their true condition of privilege, under our government—making it a question of policy, at what time, and to what extent, jurisdiction should be exercised.

If their numbers were small, and the action of civilized institutions could be brought directly to bear on them, jurisdiction has invariably been exercised, by the State, within whose limits they resided. If numerous, and detached from the vicinity of the white man, policy inculcated the propriety of treating their ignorance and their prejudices with lenity and forbearance, until they should become capable of appreciating the superior advantages of the arts and institutions of civilized society ; but how long a particular line of policy should be pursued, and when and how changed, are political, and not judicial enquiries.

It has been the uniform practice of the United States, and of all European powers, claiming possessions on this continent, to assert their sovereignty

over such Indian tribes as resided within their respective limits; and in this, they have only acted in accordance with the principles, of the Laws of Nations: it is wholly impossible to embrace them in the family of National Governments, either on the ground of right of domain, or of empire.

*Vattel* has learnedly and conclusively shewn, that a mere travelling over a country, and occasionally erecting a monument, without occupying and cultivating the soil, is not sufficient, to give a title to the domain, nor to empire; and that the pretensions of those who live by the chase, must yield to the cultivator of the soil.

There is, therefore, no soundness in the position assumed, that the savages had a right to prohibit the pilgrims from settling and cultivating a part of the soil used by them for hunting grounds.

The state of Georgia, before she ceded the territory now composing the two states of Alabama and Mississippi, to the United States, exercised, in her sovereign capacity, not only her political right of empire, but asserted her right to the soil, over the very territory from which it is now attempted to exclude the jurisdiction of Alabama. This was done by selling the fee of the soil, to certain purchasers called and generally known as the Yazoo speculators. When this sale was made, the Creek Indians were, as now, in the quiet possession, as far Indian occupancy could give such possession of the land sold. And they were then much more powerful, and from their numbers and warlike character, better entitled to rank among independent nations, than they are at present. Yet the Supreme Court of the United States, in the case of *Fletcher* and *Peck*, sustained the validi-

ty of the sale. If the United States have formed trea-
ties with Indian tribes, residing within the limits of
states incompatible with the right of state jurisdiction
over them, the authority to enter into such arrange-
ments with the Indians, must be derived from the
constitution; otherwise those *quasi* treaties can avail
nothing against the rights of the state. We have
shown that the constitution gives no such au-
thority. The enquiry therefore, how far any of them
may interpose a bar to the exercise of jurisdiction,
will be waived. If, however, it were admitted, for the
sake of argument, that those treaties, at the time they
were entered into, were valid, it might well be con-
tended, that so far as Alabama is concerned, they
have been abrogated. It is competent for Congress to
annul a treaty, and this may be done expressly or
impliedly. The making of treaties and the breaking
them, are acts of political sovereignty in the govern-
ment; and whether the principles of private or pub-
lic justice has been violated, can not be enquired in-
to by the judicial tribunals of the country.

Whatever the obligations might have been, subsist-
ing between the U. States and the Creek Indians, if
capable of being characterised at all, must have been
of a political character. In treating with the people
of the now state of Alabama, on the subject of their
assuming the rank of an independent state of the
Union, no reservation is made in favor of the rights
of the Creeks, and no reference to the relations that
might then be subsisting between that tribe and the
United States. The act authorising the people of the
Alabama territory to form a state government, is as
solemn an act as Congress could have entered into.
On accepting the terms offered, the people became

an independent state, entitled to all the rights of sovereignty and domain, not expressly reserved in the act of admission, or by the constitution of the United States; and to none more clearly than the jurisdiction over persons and property, co-extensive with her limits. The jurisdiction of a Government and its limits, are so intimately associated, that the terms may be considered as synonimous. If Congress, in defining the boundaries of Alabama, has been guilty of an act of injustice, however flagrant, against individual right, or against the rights of another government, the remedy, if any, must be sought through the political action of the government, and not through its judicial tribunals. The United States took forcible possession of Mobile, from the Spaniards, alleging that it was included in the Louisiana purchase, and extended her jurisdiction to the full extent over persons and property; those people complained, that this never was a part of Louisiana; but it was not possible to make it the subject of judicial inquiry, because it was exclusively a political question. The only condition imposed by the act of admission, on the people of Alabama, in favor of the United States, is, that they shall relinquish all right to the waste and unappropriated lands within her limits. If it had been intended by Congress, that the ultimate sovereignty, after the Indian title had been extinguished, should alone be granted, the insertion of such a provision could easily have been made, in designating our boundaries, and the necessity of so expressing it. would readily have suggested itself.

The extension of the limits of Shelby county, is not repugnant to our State Constitution: so far

from it, that the framers of that instrument, seem to have contemplated the division of the State, co-extensive with its limits, into counties. The 17th section of the 6th article, is in the following words: " The General Assembly shall, at their first session, which may be holden in the year eighteen hundred and twenty-eight, or at the next succeeding session, arrange and designate boundaries, for *the several* counties within the limits of the State, *to which the Indian title has been extinguished,* in such manner as they may deem expedient; which boundaries shall not be afterwards altered, unless by the agreement of two thirds of both branches of the General Assembly." By limiting the provision for giving permanency to county boundaries, to the counties in which the Indian title had been extinguished, it leaves the inference clear, that the members of the Convention supposed that there would be counties in which it was not extinguished. I must conclude, that in whatever aspect the question can be viewed, there is no soundness in the objections taken to the jurisdiction in the Court below; and, in the language of Judge Spencer, I know no half way doctrine on the subject: we have either exclusive jurisdiction over the Indians, co-extensive with our limits, or we have no jurisdiction over them on the smallest reserve that they may reside on, even if secured to them in fee.

The British government, before the revolution, exercised absolute dominion over the Indians within her limits in such way as policy dictated :—that all the right of sovereignty exercised by that government vested in the states, not collectively, but severally, within their respective limits ; that this sove-

reignty remains with the states to the full extent exercised by the British Crown, if not abridged by concessions made to the Federal Government; that the state of Georgia, prior to the act of Cession, could lawfully have exercised jurisdiction, and that all the right of jurisdiction is now in the state of Alabama, are the conclusions that I have arrived at, from the best reflection I have been able to bestow on the subject, and that consequently, there is no error in the record of the conviction in this case, and that the same must be affirmed.

SAFFOLD, J.—The trial was had at the Fall term, 1831, in the Circuit Court of the county of Shelby. The subject of the homicide was a Creek Indian, and the slayer a white man, citizen of this state. The crime was committed in the tract of country to which the Creek title has not been extinguished; but over which the statute of the State, of 1829, entitled "an act to extend the jurisdiction of the State of Alabama over the Creek Nation," purports to extend the boundaries of the county of Shelby; and also the jurisdiction of the Circuit Court of said county. It was contended on the trial, in the circuit court, by the prisoner's counsel, that the statute referred to, extending the limits and jurisdiction of the county, over the Indian territory, was unconstitutional and void, and consequently the Court had no jurisdiction of the alleged crime. The Court sustained its jurisdiction, but at the repuest of the prisoner, and on the authority of a statute of the State, reserved the question of jurisdiction, for the revision of this Court.

On the record thus brought up, it is now assigned for error, that on the trial below, the Judge sustain-

ed the jurisdiction of the Circuit Court, when the only proper and constitutional tribunal to try the offence was the Federal District Court.

The question of jurisdiction is one of the highest importance, in the various aspects in which it can be viewed. The authority of the States, whose limits include tribes of Indians, (at least two or three in this section of the Union,) has, for years, become a general, fruitful theme of declamation and eloquence —of remonstrance on one side, and of assertion of right on the other. By some, no subject has been thought more worthy the attention of the politician and legislator, for the furtherance of civilization among the Indians, and the more regular government of their portion of the country; by others, none better suited to enlist the sympathy of the philanthropist, in defence of what is contended to be their exclusive right of empire. The gravity of the question, and the deep interest of the subject, are alike calculated to engage the enlightened reflections of the statesman, and the prejudices of the enthusiast; nor is it wonderful, however lamentable, in times of great political excitement, that the question should mingle in the schemes of party strife.

Yet it may be hoped that this latitude of object and design, will be confined to those who are more at liberty to indulge private desires and prepossessions; that the Legislative and Executive departments of our governments, (though exposed to party contests,) have proceeded, and will continue to act, on similar subjects, with due regard to moral obligation, as well as political duty; and that the Judiciary, more especially, whose situation may be more favorable to quiet research and cool reflection, and whose

decisions are of the greatest consequence to the cause of justice, and the harmony of society, will be found capable of discharging their solemn functions, on this as well as other questions, from the dictation alone of profound reflection and included judgment. From the relative condition, however, of the slayer and deceased, in this case, if the citizens of the State should be affected by prejudice or sympathy, the natural presumption is, that such extraneous influence would operate in favor of the prisoner, because a citizen.

Is the statute in question repugnant to the Constitution of the United States, or any act of Congress passed in pursuance thereof, or any treaty (in the constitutional acceptation of the term) made under the authority of the United States? These, with the Constitution of our State, constitute the supreme law of the land; and however deliberate and reluctant the judiciary should be, in overruling an act of the Legislature, if one be found clearly irreconcileable with the paramount law—being in conflict, both can not operate—then, as an unavoidable consequence, the supreme authority must prevail.

No view of the case can be more material to the question, than that which relates to the true character, or national grade of the Creek tribe, within the chartered limits of Alabama, at the date of the statute— whether they should be regarded as a *foreign nation,* or *State of the Union*; or if neither, what other title is descriptive of their state and condition? Connected with these enquiries may arise reflections on the effect and consequences of the principles, supposing them decided either way.

It is essential to the enquiry, to investigate, not only the right of the tribe to distinct sovereignty, and the extent of federal power over their territory, but also, in illustration of those, to examine their title or interest in the soil they occupy. The latter question, however, has been frequently adjudicated by the highest tribunals in the United States; and the several decisions have been uniform, and such as command my full concurrence. These decisions maintain, that on the discovery of this immense continent, all the great nations of Europe, who had thereby acquired what they considered titles to distinct portions of it, concurred in in establishing the principles " that discovery gave title to the government by whose subjects, or by whose authority it was made, against all other European governments, which title might be consummated by possession." Also, that " the exclusion of all other Europeans necessarily gave to the nation making the discovery, the sole right of acquiring the the soil from the natives, and establishing settlements upon it."[a]—*Johnson* vs. *McIntosh.*

[a] 8 Wheat. 543.

Each nation claimed the right to regulate for itself, in exclusion of all others, the relation which was to subsist between the discoverer and the Indians.— That relation necessarily impaired, to a considerable extent, tne right of the original inhabitants; and an ascendancy was asserted, in consequence of the superior genius of the Eoropeans, founded on civilization and christianity, and of their superiority in the means, and in the art of war. The nations which respectively established colonies in America, assumed the ultimate dominion to be in themselves, and claimed tho right to grant a title to the soil, subject only to the Indian right of occupancy. The history

of America, from its earliest discovery, and especially the practice of Spain, France, Holland and England, prove the general recognition of this principle.—(See *Fletcher* vs. *Peck*[a]—*Jackson* vs. *Hudson*.[b]

[a]6 Cranch, 87.

The same authorities shew that the United States adopted the same principle; they also declare the exclusive right to exist in the general or state governments, (according to subsisting relations between them) to extinguish the Indian title by purchase or conquest—to grant the soil, *and to exercise such degrees of sovereignty over the territory, as circumstances may require;* and that this right has never been judicially questioned.

[b]3 Johns. R. 377, and 3 Kent's Co. 308.

The case of *Goodall v. Jackson,*[c] decided at *Albany,* about the same time with that of *Johnson vs. McIntosh,* at *Washington,* maintained, that the government of New York had always claimed the exclusive right to extinguish the Indian titles to lands within their jurisdiction, and that all purchases made by others were null and void.

[c]20 Johns. R. 693.

The legislature of *Virginia,* in 1779, says *Chancellor Kent,*[d] "asserted the same exclusive right of pre-emption; and the colonial and state authorities throughout the union, always negociated with the Indians, within their respective territories. as dependent tribes, governed, nevertheless, by their own chiefs and usages, and competent to act in a national character, but placed under the protection of the whites, and owing a qualified subjection, so far was requisite for the public safety. The Indian tribes within the *territorial* jurisdiction of the government of the United States, are treated in the same manner; and the numerous treaties, ordinances, and acts of Congress, from the era of our independence, down to the present time, establish the fact."

[d]3 Com. 311

In order more perfectly to comprehend and appreciate the principles of right, as established by the potentates of Europe, and to determine the relative state of the tribe in question, it is necessary briefly to investigate the early history of the title of the Indians to the soil, and the stipulations of various treaties to which they were parties.

The territory in question, having been a part of the colony chartered to Georgia, it was, in 1802, dissevered, by the articles of agreement and cession between that State and the United States; consequently the origin of title to the Creek land, as well as its subsequent state in most respects, has been the same in Georgia and Alabama. The charter of the British King, in reference to these lands, contained, among other grants, the following declaration: "that it is our royal will and pleasure, *for the present* as aforesaid, to reserve (the land aforesaid) unto our sovereignty, protection and dominion, for the use of said Indians, and we do hereby strictly forbid, on pain of our displeasure, all our loving subjects from making any purchases, or settlements whatever, or taking possession of any of the lands above reserved, without our special leave and license, for that purpose first obtained." This language is a clear indication of the assumed right of the British government to grant the future license, at pleasure.

The construction of this charter, by the Supreme Court of the United States—*Fletcher v. Peck*—as declared by the *Chief Justice*, is, "that the reservation for the use of the Indians, appears to have been a *temporary* arrangement, suspending, for a time, the settlement of the country reserved, and the powers of the Royal Governor within the territory reserved;

but is not conceived to amount to an alteration of the boundaries of the colony." He further remarks, "if the language of the proclamation be in itself doubtful, the commissions subsequent thereto, which were given to the Governors of Georgia, entirely remove the doubt."

Looking to treaties, which may be considered obsolete, except for the purpose mentioned, is found in the one between Georgia and the Creek nation, concluded at *Galphinton, in* 1785, *art.* 1, the admission, on the part of the Creeks, "that the said Indians, for themselves, and all the tribes, or towns, within their respective nations within the limits of the state of Georgia, have been, and now are, *members of the same,* since the day and date of the [original] Constitution of said state of Georgia." The 4th article stipulated, if any citizen of Georgia, or other white person, committed any capital crime, on any Indian, he should be delivered up and tried by the laws of Georgia. And by the 5th article, the nation bound themselves to inflict adequate punishment on all like offences by Indians on white persons. The treaty at *Shoulderbone,* the succeeding year, did not vary the relations in any material respect.

By the treaty of New York, in 1790, between the Creeks and United States, the latter having become the proper party, in virtue of the Federal Constitution, then recently adopted, the Nation acknowledged themselves under the protection of the United States alone; and stipulated not to hold any treaty with any individual State, nor with individuals of any State. By the same, the United States guaranteed to the Nation all their lands in the United States;

it stipulated that any citizen of the United States, who should attempt ·to settle on any of the Creek land, should forfeit their protection, and the Creeks might punish such at pleasure; and further, that no citizen of the United States should attempt to hunt or destroy game on the Creek land; nor should any go into their country without a passport. This treaty further provided, if any Indian should commit any capital crime on any citizen, the offender should be delivered up to be punished by the law of the United States; it was the same if any citizen should commit such crime in the Nation.

The treaty of *Colerain,* ·*in* 1796, authorised the President to establish trading, or military posts on the Indian lands; that the same, with land five miles square, to each, should be under .the government of the United States; but when they ceased to be necessary, they should revert to the Indians: *provided* nothing therein should " be construed to affect any claim of the State of Georgia to the right of preemption," &c., " *or to give to the United States, without the consent of Georgia, any right to the soil, or to exclusive legislation over the same, or any other· right" than those mentioned.*

Nothing contained in the treaty of. 1803, or that of 1806, cited in argument for the prisoner, is thought material; unless it can be, that the latter allows to the United States *a horse path* from Ocmulgee to Mobile.

The authorities remaining to be reviewed, are deemed more material. By the articles of agreement and cession, between the United States and Georgia, all the right, title, and claim, which the said State had to the jurisdiction and soil of the ter-

ritory, part of which composes Alabama, was ceded by Georgia to the United States, on, and subject to, express conditions—one of which was, that the territory thus ceded, should form a State, and be admitted as such into the union, in an event, that has occurred, on the same conditions and restrictions, with the some privileges, and in the same manner as is provided in the ordinance of Congress of the 13th of July, 1787, for the government of the western territory of the United States; which ordinance it was agreed should, in all respects, extend to the ceded territory.

One of the most essential privileges thus secured to the inhabitants of the territories was, that whenever they should contain the requisite population, they should be admitted, by their delegates, into the Congress of the United States, " *on an equal footing with the original States, in all respects whatever.*"

In 1819, an act of Congress was passed " to enable the people of the Alabama territory to form a Constitution and State government." · It authorised a Constitution, placing the new State " upon an equal footing with the original States, in all respects whatever;" bnt exacted as a condition, that the Constitution should be *republican*, and not repugnant to the ordinance referred to.

The same act submitted propositions to the Convention, for their free acceptance or rejection; which, if accepted, were to be obligatory on the United States. They related to the grants, of the 16th sections—of the Salt Springs—the reservation of 5 per cent. of the proceeds of the public lands, for internal improvement—and the reservation of land for the use of a Seminary. The only condition or equiva-

lent required, was in the form of a *proviso* to the grants, that the Convention should agree, by an ordinance in behalf of the people, that they forever disclaim all right and title to the waste, or unappropriated lands—that the public lands should be exempt from taxation, for five years after sold—that lands of non-residents should not be taxed higher than those of residents—that there should be no tax on lands, the property of the United States; and that all the navigable streams in the State should remain free, public high-ways.

A Constitution was accordingly adopted, similar in its provisions to those of most of the other States of the Union—no less republican—no less independent. The propositions were also accepted on the terms proposed.

Nothing appears to have been thought or said of the propriety of any stipulation limiting the sovereignty of the State in favor of the Indian tribes, nor the Federal Government. Had Congress deemed it expedient and constitutional, in the admission of the State into the Union, to restrict her rights of sovereignty respecting the Indian tribes within her chartered limits, it would appear to have been no less necessary, than to require the disclaimer respecting the waste and unappropriated lands, or the right of taxation, &c. All these charters clearly contemplated the right in the State, at no distant day, to increase civil and criminal jurisdiction over all the inhabitants of the State, co-etxensively with its limits.

The articles of agreement and capitulation, concluded at *Fort Jackson*, and ratified in 1815, from its more recent date, and the circumstances which led to it, may be consulted relative to the existing rela-

tions between the federal and state governments, and the Creek tribe of Indians; so far, at least, as these relations depend on the state of *treaties* with Indians inhabiting a state of the union.   It is not that this treaty, or capitulation, declares any great change in the condition of the tribe, within their circumscribed limits; but we understand, as historical facts, and which are declared by the instrument itself, that the nation had violated, by wanton and cruel acts of *hostility*, all former treaties between them and the United States; and consequently had forfeited all claim of protection, or other rights, previously secured to them by treaty.   By this latter treaty, all the former stipulations were renewed, which were deemed necessary and proper to be continued, and to which the United States consented, viz: that they would "guaranty to the Creek nation the integrity of all their reserved territory;" that the nation should abandon all communication with any British, or Spanish post, garrison, or town; and should refuse to admit among them, any agent, or trader, without license from the President; that the United States should have the right to establish military posts, and trading houses, within the guaranteed territory; and a right to the free navigation of all its waters; and that permanent peace should exist between them and the United States, and the neighboring tribes.

This examination is sufficient to shew, that nothing in the early history of the Creeks, or in the subsequent treaties to which they are a party; nor in the political relations between this state and the United States, can have the effect to extend the empire of the tribe, or to deny to this state any of the powers of sovereignty which properly belong to other states

45

of the union, within whose limits tribes of Indians reside. The circumstance of this state having no claim to the soil occupied by the Indians, is immaterial to the question of sovereignty. They having only the *usufructuary* interest, whether the *fee* be in this state or the United States, is a matter in which the Indian tribes have no interest or concern. Nor does the right of *ultimate domain* in the United States, warrant the increase of extraordinary federal jurisdiction over the same country, as I shall presently attempt to prove.

Hence it results, that all the powers and prerogatives, claimed and established by the potentates of Europe, over the tribes within their respective dominions in America, may, with no less propriety, be applied to the Creek tribe by our governments. As a further illustration of those rights, in the view of the Federal Judiciary, further reference may be had to the opinion of the Supreme Court, in the case cited of *Johnson v. McIntosh*. *Marshall*, Chief Justice, says, the United States maintain, as all other nations have done, " that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase, or by conquest; and gave also, a right to such a degree of sovereignty, as the circumstances of the people would allow them to exercise."

Again, the same opinion declares that the British government, which was originally ours, and whose rights have passed to the United States, "asserted a title to all the lands occupied by the Indians, within the chartered ltmits of the British colonies. It asserted also, a limited sovereignty over them, and the exclusive right of extinguishing the title which occupancy gave them. These claims," says he, "*have*

*been maintained and established as far west as the river Mississippi, by the sword."* And further, that, " however this restriction may be opposed to natural right, and to the usage of civilized nations, yet if it be indispensable to that system under which the country has been settled, and be adapted to the actual condition of the two people, it may perhaps be supported by reason, and certainly can not be rejected by Courts of justice."

As respects the pretension of empire in the Indian tribes, within the chartered limits of the states, it is a claim which has been found to involve incalculable difficulty and embarrassment; and such must be the unavoidable consequences of it, so long as the evils of conflicting sovereignty are perpetuated. It is, however, a subject, concerning which, the Supreme Court of the union has recognized principles assumed by the states, which that Court cannot retract, and which the states cannot yield.

In " *The Cherokee case, (Jan. 1831,) Marshall* Chief Justice, in declaring the opinion of the Court, remarks, " the bill requires us to control the legislation of Georgia, and to restrain the execution of its physical force. The propriety of such an interposition by the Court, may be well questioned. *It savours too much of exercise of political power, to be within the province of the judicial department."*

In the same case, and in reference to the same claim of Indian sovereignty, in opposition to that of the state, *Johnson*, Justice, observes, " I cannot entertain a doubt that it is one of a *political character altogether, and wholly unfit for the cognizance of a judicial tribunal*: there is no possible view of the subject that I can perceive, in which a Court of jus-

tice can take jurisdiction of the questions made in the bill."

The fact that the Indian tribes, while remaining in their truly anomalous state and condition, have been, *ex necessitate*, allowed to maintain the relations of peace and war, does not prove their right to general empire. The general government has been, and must remain, incompetent to the extension of general municipal authority over tribes in the situation of these; because, the power has not been delegated by the states, and to do so, would violate state sovereignty. In this state, as well as some others, it had, until recently, been considered, by the ruling power, impracticable, or inexpedient, (and perhaps some thought it unconstitutional) to extend state jurisdiction over the resident tribes. While, therefore, such has been the situation of the tribe, and they were necessarily left to govern themselves as they chose, the United States have occasionally exercised the relations of peace and war with them; but in doing so, the nation has never thought it necessary to observe the checks and restraints which the Constitution has thrown around the *war-making power*. By the Constitution, Congress alone has power " to declare war;" but after many wars have been waged with various tribes, our Code of statutes contains no declaration of war against *Indians*. The several tribes having been placed under subjection to the United States, and located within the same, the power to suppress resistance, or any internal commotion by them, and to punish any hostilities they may commit, is necessarily incident to the national sovereignty; and to the duties of the commander-in-chief, in preserving, protecting and defending the Constitution.

Were it necessary, for the consolation of the philanthropist, longer to discuss the rights of the government to exercise the powers assumed, and of the citizens to share the wilderness with the aborigines, the authority of *Vattel—Book* 1, *ch.* 18, *sec.* 209—may be invoked: he says, a celebrated question to which the discovery of the new world has principally given rise, is, whether a nation may lawfully take possession of some part of a vast country, in which there are none but *erratic nations,* whose scanty population is incapable of occupying the whole? We have already observed, in establishing the obligation to cultivate the earth, that those nations cannot exclusively appropriate to themselves more land than they have occasion for, or more than they are able to *settle and cultivate."* Further, he says, "the earth, as we have already observed, belongs to mankind in general, and was designed to furnish them with subsistence : if each nation had, from the beginning, resolved to appropriate to itself a vast country, that the people might live by *hunting, fishing* and *wild fruits,* our globe would not be sufficient to maintain a tenth part of its inhabitants. We do not therefore deviate from the views of nature in confining the Indians within narrow limits."

No founder of any American colony has been more generally, or perhaps more justly eulogised, for his moderation and humanity to the Indians, than William Penn. He has rendered his fame immortal by his acknowledged generosity or magnanimity in *purchasing lands of the Indians,* instead of taking them under his *British charter,* as all concede he, and others, had authority to do, and as they must have

had, to entitle them to encomium for forbearing to do so.

The same writer says, " we can not help praising the moderation of the English Puritans, who first settled in New-England ; who, notwithstanding their being furnished with a charter from their sovereign, purchased of the Indians, the lands of which they intended to take possession.   This laudable example was followed by William Penn, and the colony of Quakers that he conducted to Pennsylvania."

We can not, however, suppress the reflection, as the fact constitututes part of our authentic history, that the prices given by the Puritans, (Penn and others,) were scarcely more than nominal, compared with the then value of the lands : or with the prices which the United States have repeatedly offered to the various tribes in different states.   The prices originally given, were doubtless, in most instances, less, and so considered, than would have been the expense of occupying the same lands, forcibly, against the consent of the Indians ; nor is it to be forgotten, that the Indians were then numerous and formidable; and that policy may have been strongly united with humanity in dictating the terms by which the Indian titles were extinguished.

It is gratifying to know, that liberal and humane as the United States have uniformly been in relation to the aboriginal inhabitants, the course of the Federal Government, continues to evince no less magnanimity ; that, (notwithstanding complaints of some to the contrary) the national character in this respect, never shone with more lustre than at present : that from motives of humanity, and a regard to long usage and custom, the General and State Governments acknowledge the right of all the tribes, as well in the

States as Territòries, to the occupancy of their lands; their right to cede them to the United States, or an individual State, according to the circumstances; and their right to protection, &c.

The facts are also identified with the history of our country, that the government continues its uniform practice of tendering to the Indians, (such as have not yet accepted,) more than just and liberal inducements to relinquish their right of occupancy within the States, and emigrate to the west; that it has evinced the utmost solicitude to avoid coercion against them; that among other means used to avoid the necessity, and tempt them to move, it has tendered an extensive grant of lands West of the Mississippi—one, not included within the chartered limits of any State—better adapted to the habits and pursuits of the Indians than their present restricted and exhausted possessions; and where they can have, not only the absolute right of soil, but different and higher assurances of less restricted empire.

It has long been the settled policy of the government, to prevent, if possible, by negociation with the tribes, any conflict of sovereignty, or other rights, between them and the States they inhabit; and which would doubtless have succeeded ere this, with the Alabama tribes, had not the cupidity of the more artful few, triumphed over the servility of the more ignorant majorities. Under such circumstances, the sympathies to arise in their favor, from the exercise of State sovereignty over them, would appear less rational than fanatical.

. To maintain the position I assume, that the propriety of extending the jurisdiction of the State, involves a question of *expediency*, the fact is material,

that by various cessions, by the Creeks, and the consequent separation of their tribe from all others except the Cherokees, the size of their territory had been greatly reduced ; and that by emigration the same effect had been produced on the number of inhabitants.   The reduction had been such before the date of the statute in question, that this tribe were not, I conceive, distinguishable, in principle, from many of the tribes, or remnants of Indians, remaining in many of the States of the Union, over which the respective governments have long exercised jurisdiction.

The fact has not escaped me, that there is nothing in the record shewing the original size or reduction of the Creek Nation ; but it is equally true, that there is nothing shewing that they are not the smallest remnant, totally incapable of the most abject government.

Hence, if the size of the tribe be material, reference to the history of the country is unavoidable, and may be rightfully had in all such cases.   That the size is material, to sustain the argument, that the question is one of expediency, to be decided by the Legislature, appears to me to be evident, from the known fact, that the different States and Territories of the Union, contain tribes of every grade and number, from the most powerful to the most insignificant, imaginable.

It will be  seen from the statutes of the different states, that many of them, before and since the adoption of the Federal Constitution, have exercised the right of passing laws in relation to the Indians within their limits; not only to secure and protect the lands, and regulate commerce between them and the

whites; but, in many instances, they have subjected the Indians to ordinary municipal regulations; and more generally, have extended criminal jurisdiction alone, over their territory.

Of the various acts of the kind referred to, a few only need be noticed; and first, one of New York, passed in 1822, entitled "an act declaring the jurisdiction of the Courts of the State," and pardoning *Tommy Jemmy*. The preamble recites, among other state rights, that "the sole and exclusive cognizance of all crimes and offences, committed within this state, belongs, of right, to Courts holden under the Constitution and laws thereof, as a necessary attribute of sovereignty, except only crimes and offences, cognizable in the Courts deriving jurisdiction under the Constitution and Laws of the United States."— And further, that "it has become necessary, as well to protect the said Indian tribes, as to assert and maintain the jurisdiction of the Courts of the State, that provision should be made in the premises"— therefore, the act proceeds to declare full power and jurisdiction accordingly. By the same act it was declared, that *Tommy Jemmy*, an Indian of the Seneca tribe, having been indicted for the murder of an Indian woman of the same tribe, committed within the same reservation; and it having been represented, that the alleged murder had been committed under pretence of Indian authority—therefore, he should be pardoned.

Thus the great state of New York has asserted sovereignty over Indians, who, according to the language of the Court of Errors, of that state—*Goodell vs. Jackson*—"once formed the fiercest and most formidable confederacy of Indian republics ever known[20 Johns. 693.]

46

in *North America*; and who, by their prowess and enterprise, held distinct tribes of Indians under dominion and tribute;'' but who, after the settlement of the colony, and their communication with the whites, had degenerated and descended, by gradual, but perceptible degrees, from their original elevation.

In a previous trial of the case here referred to, before the Supreme Court of that state,[a] *Spencer*, Chief Justice, in delivering the opinion of the Court, on the same subject, remarks, "we do not mean to say that the condition of the Indian tribes, at former and remote periods, has been that of subjects or citizens of the state. Their condition has been gradually changing, until they have lost every attribute of sovereignty, and become entirely dependent upon, and subject to our government. I know of no half way doctrine on this subject. We either have an exclusive jurisdiction, pervading every part of the state, including the territory held by the Indians, or we have no jurisdiction over their lands, or over them, whilst acting within their reservations. It cannot be a divided empire; it must be exclusive as regards them, or us." It is said there were then about 6,000 *Indians in New York*.

The Court of Errors reversed the judgment of the Supreme Court; but the merits of that controversy are immaterial to the question before us; the language of those Courts is quoted only to shew the light in which Indian tribes, residing within the chartered limits of other states of the union, are viewed by them. The opinion of the Court of Errors, also denied, that these Indians were citizens of the state, and remarked, "one community may be bound to another, by a very unequal alliance, and still be a sovereign state;''

a20 Johns.
188.

that, "though a weak state, in order to provide for its safety, should place itself under the protection of a more powerful one, yet according, to *Vattel*,[a] if it reserves to itself the right of governing its own body, it ought to be considered as an independent state." There are several kinds of submission, says this same Jurist.[b] The submission may leave the inferior nation a part of the sovereignty, restraining it only in certain respects, or it may totally abolish it, or the lesser may be incorporated with the greater power, so as to form one single state, in which all the citizens will have equal privileges."

[a] B. 1. c. 1. sec. 5 & 6.

[b] B1.ch.16. sec. 194.

That Court, I think, failed in their attempt to identify the Indian tribes with allies of the first description. They rely, mainly, on the position, that the Indians were not subjects, born within the perview of the law, because not born in obedience to the state, but under the dominion of their tribes. What would be the weight of this argument, if the superior power had, or should assert and maintain its claim of exclusive sovereignty, under the right of discovery and conquest, or either; that the Indians should cede all their lands and remain in the state; or ceding part or none, should dwindle to a condition so degenerate and feeble as to be wholly incapable of self-government; which latter, the legislature of that state declares to have been their condition in 1822; at least, that the legislation of the state had become necessary to the protection of the Indians. This doctrine of partial sovereignty, remaining in the inferior, by the terms or submission, I consider entirely incompatible with the sovereign rights of the states within their chartered limits; and no less inconsistent with the political relations of the general and

state governments, as established by the letter and spirit of their Constitutions. I maintain that this reservation of partial sovereignty cannot exist, *within the states*, as a permanent obligation, either to the United States, or the Indian tribes; that it can exist only as a matter of comity, expediency, or policy, in the discretion of the states respectively; and continue so long only as these motives shall command the forbearance of the state.

The Court of Errors, however, predicated their decision and reasons, mainly, on the condition of the Indians forty years previously, (when they were much more fierce and formidable,) at which time, the right then in contest was said to have accrued. In allusion to the act of that state, of 1822, asserting jurisdiction and pardoning the Indian, they say, "admitting that this act completely annihilated the national character and sovereign attributes of the *Six Nations*, what has this fact to do with the inquiry, how those relations stood forty years ago," when the right in question vested? they do not expressly deny the power of the state to *annihilate* the sovereignty of the nation; but decide they had not done so at the time referred to.

There would appear much less difficulty in identifying the New York Indians, and others in like condition, with the latter description of allies, given by Vattel, "where the lesser may be incorporated with the greater power, so as to form a *single state*, in which all the citizens will have equal privileges." And if it be found inexpedient to grant, to all, full citizenship at first, but only progressively, the principle is equally sustainable. The act of New York (1822,) as fully prostrated the Indian sovereignty, as

any more comprehensive legislation could have done ; and it appears to have been sustained by the Judiciary.

To shew the views of the British government, at a comparatively recent date, it may not be irrelevant to quote a section of an act of Parliament, in 1803. It is, "that from and after the passage of this act, all offences committed within any of the Indian territories, or parts of America, not within the limits of either of the said provinces of Upper or Lower Canada, or of any civil government of the United States, shall be, and shall be deemed to be, offences of the same nature, and shall be tried in the same manner, and subject to the same punishment, as if the same had been committed within the provinces of Upper or Lower Canada."

The act of Congress, "to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers," is also relied on for the prisoner, in opposition to the jurisdiction of the state.

Among other regulations, it provides that the Courts of each of the Federal Districts, in which any offender against this act shall be apprehended ; or, agreeably to the provisions thereof, shall be brought for trial, shall have full jurisdiction of all crimes and misdemeanors against the same.

One of the sections provides, that if any citizen shall go into any town, settlement, &c., of any tribe of Indians, and there commit murder on any Indian, of any tribe in amity with the United States, the offender shall suffer death.

The act " to provide for the punishment of crimes and offences, committed within the Indian boundaries," subjects offences committed in any Indian territory, which, if committed within the sole jurisdic-

tion of the United States, would be subject to conviction and punishment to like proceedings in the United States Courts—provided no Indian treaty be thereby infringed; and that such jurisdiction shall not extend to any offence committed by one Indian against another within any Indian boundary.

Consistently with the spirit of our Federal and State Governments, the acts of Congress, as well as various treaties referred to must have been mainly intended, as far as respects the exercise of judicial power over Indian territory, to establish the relation between the United States and Indian tribes, while the latter occupied lands embraced only by *territorial forms* of government; and which, from their recent organization, sparce population, and subjection to, and dependence on the general government, were incompetent to the efficient exercise of full sovereignty. Far different, according to the fundamental principles of the union, are the powers and privileges of the state governments. If, however, it be conceded, that the treaties and statutes referred to, were partially intended to apply also to tribes of Indians inhabiting the states, it could only have been, as already suggested, for a limited time, during the infancy of the states; or, while any particular tribe should remain so savage, fierce, or formidable, as to render it impracticable, or inexpedient, to subject them to state empire. Such, we find, is not the relative condition of this state and the Creeks.

The position, with others, has been assumed in argument, that the admission of Alabama into the union, with defined boundaries, cannot confer jurisdiction commensurate with these limits; because, it would be to confer greater powers on the grantee

than the grantor possessed. The tendency of this ar-
gument would be, to prove that the jurisdiction be-
longs to the Creek tribe. It would be an intolerable
proposition, that a citizen of the United States, under
the Constitution thereof, and of this state, should be
subjected to the Creek mode and manner of trial
and punishment. It is a power claimed, perhaps,
by no tribe, but yielded to the United States by
either the express or implied stipulations of various
compacts or treaties, and which the latter have claim-
ed, so far as such jurisdiction was deemed compati-
ble with federal and state empire. The fact, that
such power has never been claimed, or tolerated, in
favor of any tribe, by any American treaty, furnishes
a strong argument against the existence of Indian
right of sovereignty, *in any respect*, after the earliest
time when the state, inhabited by them, finds it ex-
pedient to extend its jurisdiction over them.

The 19th section of the intercourse law, seems to
have contemplated the necessity of such a reserva-
tion of state authority—it provides, that the act
" shall not be construed to prevent any *trade* or *in-
tercourse* with Indians living on lands surrounded by
settlements of the citizens of the United States, and
being within the ordinary jurisdiction of any of the
individual states." Statutes are to be construed ac-
cording to their reason and spirit, without a scrupu-
lous regard to their literal expressions. The reason
and necessity for the extension of the jurisdiction
over the Creek country, in its present state, is sub-
stantially such as above contemplated. The Creek
tribe, as also the Cherokees adjoining, " are sur-
rounded by settlements of the citizens of the United
States." It cannot be required, that they should be

inhabitants of the same state; nor that the surrounded Indians should be of the same tribe—neither requisition could be made without the grossest absurdity. Surely, the Indian authority cannot derive strength, from the circumstance of their being located on a line, or lines, dividing two, three, or more states; nor from any given number of Indians being divided into two, or more distinct tribes. If such construction prevail, the consequence must be, that the very circumstances which render them more obnoxious and embarrassing to the citizens, by bringing their governments into conflict with those of several states, instead of one; or by leaving them a more impotent and degenerate community, from their division into distinct tribes, would have the effect to rivet them permanently on the state, or states. The Creek claim to distinct empire is, in principle, but the same that it would have been, had their territory been removed on the east, a few miles from the Georgia line, and on the north, as many from the Cherokees; and if the intermediate spaces had been occupied by freeholders, or intruders, citizens of the United States. The argument, that this provision can only apply to tribes that were, *at the passage of the law,* (1802) thus surrounded by citizens, would appear equally refined and preposterous. The law is general in relation to the Indians in the states, and territories of the union. The government was the only party to it. It is not in the nature of a compact, operating on the parties only, and to be varied by their mutual consent ; but it stands as a law of the union, establishing rules uniform and universal, requiring a construction to suppress the evils and advance the remedy—to be applied to each tribe,

whenever its state and condition shall justify and require it. The law imports no designation of the individual tribes, or nations, to which it does, or does not apply, but merely defines the general principle of its application; the most important of which is, that it does not apply to prevent trade, or intercourse, with Indians living "within the ordinary jurisdiction of any of the individual states," *at the time when the question of sovereignty, or jurisdiction may arise.*

In all the British charters for American colonies, and in the articles of agreement and cession between the United States and Georgia, (though including Indian tribes,) are to be found express cessions of sovereignty to the grantees; on the contrary, it has never been deemed necessary, nor is there an instance of a cession from any Indian tribe, in which the right of sovereignty is expressed as a part of the rights ceded.

In determination of these vexed questions of conflicting empire, it may not be irrelevant to notice, briefly, how they stood under the confederation; and what changes have been since effected in the political relations of the parties.

It is declared, (*article* 2,) that "each state retains its sovereignty, freedom and independence, and every power, jurisdiction, and right, which is not by this confederation expressly delegated to the United States in Congress assembled."

(*Article* 9.) The United States in Congress assembled, shall have the sole and exclusive right and power of "regulating the trade and managing all the affairs with the Indians, *not members of any of the states: provided the legislative right of any state, within its own limits, be not infringed, or violated.*"

47

The Constitution subsequently adopted, contemplated the extension of jurisdiction over, at least, some of the tribes ; (as many, and at such times, according to reasonable inference, as the states might deem expedient;) one evidence of it is, that Indians subjected to state taxation, are authorised to be included in the federal census.

Nor is there found in the Federal Constitution, more than in that of our state, any authority in the United States, to exercise the right of *sovereignty* over, or regulate *intercourse* with, the Indian tribes. The relative powers of the federal and state governments have been permanently established, by the sacred fundamental principles of the union ; so that they cannot be essentially varied, even by mutual consent, unless by an alteration of the Constitution, in the manner therein prescribed.

The relation is strongly demonstrated by the *3d section, 4th article* of the Constitution, which provides, "that new states may be admitted by the Congress into the union ; but no new state shall be formed, or erected, within the jurisdiction of any other state, nor any state be formed by the junction of two or more states, or parts of states, without the consent of the legislatures of the states concerned, as well as of the Congress." It further declares, that "Congress shall have power to dispose of, and make all needful rules and regulations, respecting the territory, or other property, belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claim of the United States, *or of any particular state.*"

The Supreme Court of the Union, in the case of the *Cherokee Nation* vs. *Georgia,* appears to have left the relation of the Indian tribes to the United

5 Peters R. 1.

States, in an awkward dilemma. The opinion delivered by *Marshall*, Chief Justice, raised the preliminary question, whether that Court had jurisdiction of the case. He remarks, "the 3d article of the Constitution describes the extent of the judicial power. The second section closes an enumeration of the cases to which it is extended, with "controversies" between a state, or the citizens thereof, and foreign states, citizens, or subjects"—that a subsequent clause of the same, gives the Supreme Court original jurisdiction in all cases in which a state shall be a party. The party defendant may then unquestionably be such in this Court. May the plaintiff sue in it? Is the Cherokee nation a foreign state, in the sense in which that term is used in the Constitution."

He continues, "their counsel have shewn conclusively, that they are not *a state of the union*, and insist that, individually, they are aliens, not owing allegiance to the United States." He also says, "the condition of the Indians in relation to the United States, is, perhaps, unlike that of any other two people in existence. In the general, nations not owing a common allegiance, are foreign to each other. The term, foreign nation, is, with strict propriety, applicable by either to the other. But the relation of the Indians to the United States, is marked by peculiar and cardinal distinctions, which exist no where else."

After advancing other views against their claim to the capacity of a foreign nation, the Court decides, that "they may more correctly, perhaps, be denominated *domestic dependent nations*"—that "they occupy a territory to which we assert a title independent

of their will, which must take effect in point of possession, when their right of possession ceases : meanwhile, they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian." Supposing such to be the true relation, whose right and privilege is it to terminate this wardship and pupilage? or by whom, and in what way, are they to be governed while it continues? The only way it ever has been, or can be, effectually done, is by the action of the state government, and that by the extension of its laws, as has been done by the statute in question. It was, as we have seen, an authority with which the state was invested, before the adoption of the Federal Constitution, and which has never been transferred, or relinquished. The contrary was not, on that occasion, maintained by the Supreme Court.

In as much then, as the Indian nations are not to be regarded, either as *foreign states*, or *states of the union;* but are unlike any other people in existence; their right to a separate existence, and that within regular constitutional states of the union, is found to be not more anomalous, than embarrassing to the states. Locally and politically, they are excluded from every portion of the world, except the United States. They can have no *alliances, confederation, intercourse, or commerce*, with any foreign nation. They have yielded these rights, by various compacts, or treaties, with our general, or state governments.

In "the Cherokee case" referred to, Chief Justice *Marshall*, in reference to these tribes, remarks, they and their country are considered, by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United

States, that any attempt to acquire their lands, or to form a political connection with them, would be considered, by all, as an invasion of our territory, and an act of hostility.

In the same case, *Johnson*, Justice, observes, "when this country was first appropriated, or conquered by the crown of Great Britain, they, (the tribes of Indians,) certainly were not known as members of the community of nations; and if they had been, *Great Britain, from that time, blotted them from among the race of sovereigns. From that time, Great Britain considered them as her subjects, whenever she chose to claim their allegiance ; and their country as hers both in soil and sovereignty.* All the forbearance exercised towards them, was considered as voluntary; and as their trade was more valuable than their territory, for that reason, and not from any supposed want of right to extend her laws over them, did she abstain from doing so." Further, he says, "they have in Europe *sovereign* and *demi-sovereign states*, and states of *doubtful sovereignty*; but this (the Indian) state, if it be a state, is still a grade below them all; for not to be able to alien, without permission of the remainder man or lord, places them in a feudal dependence."

If it be suggested, that the United States government has recognized the Indian tribes as states, or nations, by holding various *treaties* with them, my reply is, that names may, or may not, be very material. If the government should enter into any legal agreement, or compact, with an individual, corporation, or voluntary association of persons, and should entitle it a *treaty*, instead of *agreement, compact, grant,* or *charter*, and no undue privileges were

claimed under it, by virtue of the name, no injury could result from the *misnomer*. So, with the Indian treaties—they must have effect according to their ligitimate nature, regardless of their title; and if the opinion be correct, that the tribes are not such nations, or states, as were contemplated by the Constitution; not such as the United States are authorised to form *"treaties"* with, in the diplomatic sense of the term, (and which may become a part of the supreme law of the land,) the title with which they have been dignified, cannot give them that virtue, nor prove that the government could not, rightfully, make such compacts as they have done, to answer other purposes as therein expressed."

The validity of these treaties has seldom come in question, nor can it often; because they are, doubtless, binding on the Indians as parties; and, generally, binding on the United States, because authorised to dispose of the public lands, or at least extinguish the Indian title to it; and regulate commerce with the Indian tribes; and also, because the latitude of this treaty-making power, with Indian tribes, is so defined and circumscribed, by rights constitutionally established, that a violation of them would scarcely be attempted. This doctrine was recognized, and forcibly expressed by the American Commissioners, during the negotiations at Ghent. "The treaty of Greenville," say they, "neither took from the Indians the right which they had not, of selling lands within the jurisdiction of the United States, to foreign governments, or subjects; nor ceded to them the right of exercising exclusive jurisdiction within the boundary line assigned. It was merely declaratory of the public law, in relation to the parties, founded on

principles previously and universally recognized."

'Relying on the foregoing'review as establishing the positions, that the Indian tribes are not states, entitled to any constitutional right of empire, after the individual states embracing them, deem it expedient to incorporate them; and that the Creek tribe have no jurisdiction of crimes similar to the one in question; it only remains to be shewn, by further illustration, that the federal judiciary has not the jurisdiction, at least, exclusively of the state authority.

The Indians have an appropriate character and attitude assigned them by the Federal Constitution. It provides, (8 sec. 1 art.) that Congress shall have power "to regulate commerce with foreign nations, among the several states and with the Indian tribes." Surely, the latter were intended to be distinguished from each of the former, or the different character or epithet would not have been used. · As previously remarked, this right "to regulate commerce" is believed to have reference to tribes of Indians in a far different condition from those in question—nor can it be admitted, that this right to regulate commerce, can disparage the ordinary right of state sovereignty over the same country. The form and manner of the delegation of power, as well as the literal words, confers on Congress only the same power, which it may exercise with foreign nations, and among the several states. To this authority, thus interpreted, the state has not objected, nor does the jurisdiction in question conflict with this power. And this is the clause of the Constitution mainly relied upon by the prisoner's counsel, and all who oppose the state's right of sovereignty over the tribes.

It then becomes material to enquire what has been

the prevalent construction of the clause of the constitution, authorising Congress "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes?" Would it not be a strange *heresy* to maintain, that it confers authority, to exercise general municipal powers; or even to punish crimes and misdemeanors? If such be its effect, it can not fail to annihilate the sovereignty of every State in the Union; and also of Europe, could it be enforced.

That the clause in question has never been considered, in the State of New-York, to affect the ordinary rights of State sovereignty, is fully shewn by various decisions of their highest tribunals—*Livings-* a9 Johns R ton vs. *Van Ingen,*—*Gibbons* vs. *Ogden.* In the last 507. case an appeal having been taken to the Supreme Court b17Ib. 488. of the United States, that Court holding the powers of the State less, and those of Congress more extensive than they had been adjudged by the Court of Errors in New-York, reversed the decree of the latter; but in doing so, recognised a construction of this clause of the Constitution totally inconsistent with the *magic* influence which has been recently ascribed to it. The decision by *Marshall,* Chief-Justice, remarks, that though the inspection laws might have a remote and considerable influence on commerce, the power to pass them did not arise from the authority to regulate *commerce.* He adds, "they act upon the subject before it becomes an article of foreign commerce, or of commerce among the States, and prepare it for that purpose. They form a portion of that immense mass of legislation which embraces every thing within the territory of a State, not surrendered to the general government: all which can

be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c., are component parts of this mass. No direct general power over these subjects is granted to Congress; and consequently they remain subject to state legislation."' <sup>a</sup>9 Wheat. 203.

I, therefore, arrive at the conclusion, that the power of the state to extend its jurisdiction over the Creek territory, (claiming no right to dispose of the soil, or dispossess the occupants,) cannot be succesfully resisted on the authority of the clause of the Constitution relating to commerce—of the intercourse law of 1802, or any other acts of Congress in relation to the same.

The prosecuting counsel refers to clauses in the Federal Constitution, and to the act of Congress, in pursuance thereof, which, he contends, negative the idea of jurisdiction in the United States Courts.— These clauses are, (*art.* 1, *sec.* 8,) that Congress shall have power to exercise exclusive legislation "over all places, purchased by the consent of the legislature of the state in which the same shall be erected, for *forts, magazines, arsenals, dock yards,* and *other needful buildings,*" and to pass all laws necessary to the execution of the power. The act of Congress, as will presently be seen, is rather more comprehensive in its terms. But the exposition of them by the Supreme Court, at Washington,—*United States vs. Bevans*—denies their application to Indian territory. ₁3 Wheat. Without stopping to examine the merits of the case, ₃₃₆. which are unimportant to our purpose, it is sufficient to say, it involved the construction of the .

clauses of the Constitution referred to, and of the 3d section of the act of Congress, passed under the authority of the same, in 1790, entitled "an act for the punishment of certain crimes against the United States," the language of which is, "that if any person shall, within any fort, arsenal, dock-yard, magazine, or any other *place*, or *district of country*, under the sole and exclusive jurisdiction of the United States, commit the crime of wilful *murder*," such person shall suffer death. *Marshall*, Chief Justice, in delivering the opinion of the Court, declared, that "the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative powers:" and in reference to the construction of the section of the act recited, says, "when the sentence proceeds with the words, 'or in any other place or district of country, under the sole and exclusive jurisdiction of the United States,' the construction seems irresistible, that by the words, *other place*, was intended another place of a similar character with those previously enumerated, and with that which follows. Congress might have omitted, in its enumeration, some *similar* place within its exclusive jurisdiction, which was not comprehended in any of the terms employed, to which some other name might be given; and, therefore, the words *other place, or district of country*, were added; but the context shows the mind of the legislature to have been fixed on territorial objects of a *similar* character."

Nothing more is deemed necessary, to shew the total inapplicability of that authority to a crime committed on *Indian territory*, for which the United States have no special reservation, for purposes similar to those enumerated; that such places are not

embraced by implication; nor have the prisoner's counsel relied on this authority.

The circumstance of the United States having the ultimate right of soil, cannot impair the right of sovereignty. There is no incongruity in the proposition, that the right to the public domain resides in the United States, while the ordinary right of empire, over the same territory, is vested in the state government. Such is, and has been, the condition of most or all the new states. While the United States have possessed and exercised the right to dispose of the unappropriated lands, and even to remove intruders from them, the states, containing them, have, as uniformly, exercised the ordinary municipal government.

*Vattel's* doctrine, relative to *domain*, cannot fully apply to the peculiar rights and relations of our governments; but so far as it can apply, it sustains these positions. He says,[a] "the *useful domain*, or the domain confined to the rights that may belong to an individual in the state, may be separated from the *sovereignty ;* and *nothing prevents the possibility of its belonging to a nation in places that are not under her jurisdiction. Thus, many sovereigns have fiefs, and other possessions, in the territories of another prince ;* in these cases, they possess them in the manner of private individuals." The *eminent domain,* he defines to be, "the right, which belongs to the society, or to the sovereign, of disposing, in cases of necessity, and for public safety, of all the wealth contained in the state."

The right to the waste, or unappropriated lands, within this state, (which must include the lands occupied by the Indians, if not before, after the extin-

[a] B.2. ch.7, sec 87.

guishment of their title,) however it might otherwise have been, was reserved to the United States, by agreement between the two governments, at the time of the admission of the state to self-government. The consequence of this state of things, according to my doctrine, is, that while the United States hold the *seisin,* or *ultimate fee,* and have guaranteed to the Indians the *usufructuary interest* in the soil they occupy, the state government, [without any claim to the soil,] possesses the same right of sovereignty, to the extent of our chartered limits, that is common to other states of the union, under the Constitution thereof. At the same time, the United States can rightfully exercise that degree of federal sovereignty and jurisdiction, which belongs to them, in, and over other states of the union.

The result of this investigation is, that the tribe in question cannot be regarded either as a *foreign nation,* or *state of the union;* that, if from want of rank in the community of nations, or states, they must be considered (as denominated by the Supreme Court of the United States,) "a domestic dependent nation," in a state of "pupilage," and unlike any other recognized by any nation; their wardship has general relation, as their guardian, to the state whose limits they inhabit; with the exception of the rights necessarily incident to the ultimate right of domain remaining in the United States, and the power in Congress to regulate commerce with the Indian tribe, as it may do with foreign nations, and, elsewhere, among the several states; that this guardianship over the tribe was vested in the local government, (if not before,) by the admission of the territory to the powers and privileges of state government; and that

the proper time and manner of exercising the trust,
(and of course, abolishing the Indian laws and cus-
toms,) are, and have been, questions of grave duty,
resting in the discretion of the legislature.    I con-
sequently maintain, that the statute in question is
constitutional and valid, and the conviction of the
prisoner legal; and that the judgment must be af-
firmed.

TAYLOR, J.—This case involves the question of
the validity of the statute, passed by the general as-
sembly of this state, in 1829, entitled, "an act to
extend the jurisdiction of the state of Alabama over
the Creek nation."

That act extends the limits of the counties lying
contiguous to the country occupied by the Creek In-
dians, over adjoining parts of that country, and gives
plenary jurisdiction, both civil and criminal, to the
Courts of the several counties, over the territory thus
added to them.

Under the provisions of this act, Caldwell was in-
dicted in the county of Shelby for the murder of an In-
dian, which, on the trial, was proved to have been
perpetrated within the Creek country, and within
the bounds of that county, as defined by the statute.

Caldwell has been tried and convicted, but the
question of jurisdiction, which brings into considera-
tion the constitutionality of the statute under which
the conviction has taken place, was reserved as novel
and difficult, by the Judge of the Circuit Court, for
the decision of this Court.

I deem it unnecessary to transcribe any part of
the statute; it is enough to say, that its provisions
are fully adequate to effect the object intended by it,

that of placing all persons within the Creek country as completely under the jurisdiction of our Courts as is possible. The only subject of investigation is, has the general assembly exceeded its powers in making this enactment?

The case before us is certainly of the greatest magnitude of any upon which we have ever been called to decide. In it every thing is combined which is calculated to give importance to the judgment we may award, and to render the duty we have to discharge, both delicate and painful.

We are to determine whether the legislature of the State has passed an act which is prohibited by the Constitution of the United States, and whether a fellow-creature has forfeited his life to the demands of the law? These questions, of themselves, are solemn and weighty, and demand the greatest circumspection, and most serious consideration at our hands. But there are others involved in the decision of this cause, more deeply affecting the interests of the state, and to which the attention of the people of the United States is, at this time, particularly excited. They relate to the authority of a state to interfere with the internal regulations of any Indian tribes who may reside within its boundaries, and its power to bring the persons and property within an Indian country thus situated, under the jurisdiction of its laws.

To Alabama these questions are peculiarly important, on account of the great proportion of her territory which is embraced within the country now occupied by Indians : and, in effect, we are now to decide whether the jurisdiction of this state is to be restricted to about two-thirds of its extent, or to be co-extensive with its limits.

Whatever may be urged, elsewhere, with respect to natural and abstract rights, this Court, before it can interpose its judgment to arrest the course of an act of the legislature, must be of opinion that that body has infracted the fundamental law of the land in the provisions of the act.

It is a principle of the common law of England that the parliament is supreme. This principle applies equally to our general assembly, with the exception of the restraints which are imposed upon it by the Constitutions of the United States and of this state.

To the case before us, I have given as close and minute an examination as the means within my reach have enabled me to do, and the conclusion to which I have come, although different from that of some eminent jurists, for whose learning and ability I entertain the utmost respect and deference, is most decided.

The nature of the subjects presented by the case, and the particular circumstances under which they have been agitated, demand a more minute and extended examination than I am in the habit of embracing in a written opinion.

I will first endeavor to determine upon the political condition of the Indians generally, and their rights as communities, as recognized by civilized nations. In order to do this in a satisfactory manner, it will be necessary to take an extensive range, touching upon the peculiar laws of civilized countries in reference to individual Indians, if there are or have been any such laws, in order that the opinion which has been entertained with regard to this kind of population, may be the more clearly understood

Nor shall we fail to derive aid in this investigation by an examination of writers on the law of nations. So far from being overlooked, the condition of the Indians of North America, and their rights, as well as the peculiar rights and privileges of the European states, whose subjects first discovered this continent, are largely discussed by these writers.

*Vattel* (page 92) lays down the following doctrine: "The cultivation of the soil is not only to be recommended by the government, on account of the extraordinary advantages that flow from it; but from its being an obligation imposed by nature upon mankind. The whole earth is appointed for the nourishment of its inhabitants: but it would be incapable of doing it, was it uncultivated. Every nation is then obliged, by the law of nature, to cultivate the ground that has fallen to its share; and it has no right to expect or require assistance from others, any farther than as the land in its possession is incapable of furnishing it with necessaries. Those people, like the ancient Germans, and the modern Tartars, who, having fertile countries, disdain to cultivate the earth, and choose rather to live by rapine, are wanting to themselves, and deserve to be exterminated as savage and pernicious beasts. There are others, who, to avoid agriculture, would live only by hunting and their flocks. This might, doubtless, be allowed in the first ages of the world, when the earth, without cultivation, produced more than was sufficient to feed its few inhabitants. But at present, when the human race is so great multiplied, it could not subsist if all nations resolved to live in that manner. Those who still retain this idle life, usurp more territories than they would have occasion for, were they to use honest

labor, and have therefore no reason to complain, if other nations, more laborious and too closely confined, come to possess a part. Thus, though the conquest of uncivilized Peru and Mexico was a notorious usurpation, *the establishment of many colonies on the continent of North America may, on their confining themselves within just bounds, be extensively lawful.* The people of these vast countries rather overran than inhabited them."

Again, the same writer uses the following language : (page 153–4)—"There is another celebrated question, to which the discovery of the new world has principally given rise. It is asked if a nation may lawfully take possession of a part of a vast country, in which there are found none but erratic nations, incapable, by the smallness of their numbers, to people the whole ? We have already observed, in establishing the obligation to cultivate the earth; that these nations cannot exclusively appropriate to themselves more land than they have occasion for, and which they are unable to settle and cultivate. Their removing their habitations through these immense regions, cannot be taken for a true and legal possession; and the people of Europe, too closely pent up, finding land of which these nations are in no particular want, and of which they make no actual and constant use, may lawfully possess it, and establish colonies there. We have already said that the earth belongs to the human race in general, and was designed to furnish it with subsistence : if each nation had resolved, from the beginning, to appropriate to itself a vast country, that the people might live only by hunting, fishing, and wild fruits, our globe would not be sufficient to maintain a tenth

part of its present inhabitants.    People then have not deviated from the views of nature, in confining the Indians within narrow limits.    However, we cannot help praising the moderation of the English puritans who first settled in New England; who, notwithstanding their being furnished with a charter from their sovereign, purchased of the Indians the land they resolved to cultivate."

Again (page 228)—" No nation can appropriate to itself a too disproportioned extensive country."

These doctrines are maintained by Martens, Montesquieu, and every respectable writer who has treated on the same subject.

It thus appears that the human family is divided, by these writers, into two classes.    1st. Agriculturists, or those who use the earth in that way which is calculated to secure the subsistence and happiness of the greatest number of inhabitants, and whose possessions, therefore, cannot be rightfully invaded ; and, 2nd, Those who are erratic in their habits, who do not use the soil over which they roam, but live either by rapine and violence, or depend upon the precarious supplies afforded by hunting, fishing, and wild fruits.    The country which the latter " overrun rather than inhabit," may be lawfully occupied by those of other nations who intend to appropriate it to agricultural purposes, if they " confine themselves to just bounds :" that is, as I understand it, leave an ample territory to these nomadic tribes to subsist upon by becoming cultivators of the soil, and to furnish them with necessary supplies by their usual pursuits, until they can effect the necessary change in their mode of life.

If this is not the view which is taken of these

wandering tribes and hordes, why the compliment which is paid by Vattel to the English puritans who first settled New England. If he did not consider their charters as vesting them with ample authority to possess themselves of so much of the Indian lands within their limits as they chose or were able to do, without making any compensation to the aboriginal occupants, why praise those early settlers, because " notwithstanding their being furnished with a charter from the sovereign, they purchased of the Indians the land they resolved to cultivate?" But more especially, if this sovereign himself had no legal right to touch a foot of those lands, except such as he acquired by treaty, by what mode of reasoning could the author come to the conclusion, that the puritans had exhibited a moderation and forbearance towards the inhabitants of the forest, which demanded the tribute of his praise?

It is obvious that this writer believed, that the European discover of a country possessed by wandering tribes of Indians, had a right to appropriate to himself so much of their territory as he required, to be used for the purpose of tillage, and that he considered the charters which were granted to our ancestors, by the King of Great Britain, as conveying this right.

To sustain the constitutionality of our statute, it is not necessary to show a right in the sovereign of civilized nation, discovering a country inhabited by wandering savages, to appropriate any part of their soil to the use of his subjects; for the statute does not authorise the possession of a solitary Indian to be disturbed: but to avoid the possibility of coming to an erroneous conclusion to the injury of the In-

dians, and to have every proper analogy before me to assist in forming an opinion upon the subject of jurisdiction, I have thought it right to bring to my aid the doctrines which have obtained in the civilized world, with respect to the right of soil in Indian lands.

To avoid every probability of error on this subject, I will now enter into an examination of the views of some of the European sovereigns, whose subjects first discovered, and who established colonies in different parts of this continent; and of our ancestors, the first emigrants from Europe, to the country now included within the limits of the United States: with regard to the power which they possessed.

It would be a waste of time to produce proof that that the territory within those discoveries, was considered by all the civilized world as annexed to, and forming a part of the dominions of the state whose subjects made the discovery. This has not, in the argument of this case, nor, I believe, upon any other occasion, been controverted. It has uniformly been considered as much an aggression for another nation to intrude upon its domain, as upon any other of its possessions. Nor had any other state a right to carry on any intercourse with the inhabitants of the discovered country without the consent of the sovereign who held by discovery, although ninety-nine out of every hundred of those inhabitants might have been Indians, and probably were. It is true, unless some indication of an intention to occupy the country was given by the discoverer, it was open to the first power which did occupy it, and in such case the lat-

ter power possessed all the rights and privileges of dominion.

Notwithstanding frequent wars took place between European nations on account of their American possessions, many of which originated in disputes about boundaries, yet the principle here laid down was never contested. For information on this subject, the inquirer may successfully resort to the able opinion of Chief Justice Marshall, delivered in the case of *Johnson* vs. *McIntosh*[a]

*8 Wheat. 571.*

It is useless, for practical purposes, now to inquire, by what authority these discoverers obtained for their government such extensive rights over this immense continent, and the numerous nations who inhabited it? Or whether nature has given this power to agriculturists, over hunters or fishermen? The power has been in constant exercise for centuries, and it is not for courts of justice to found their decisions upon abstract speculations, but upon law, and precedent having the force of law.

The acts of the sovereigns of Europe, from the first discovery of America, show that they maintained their rights in those parts of it which were discovered by their subjects respectively, to be as ample and their jurisdiction as complete, as property in the soil, and dominion over the country could make them.

The charter granted by the King of Spain to Columbus, is expressed as follows: "In order that in the said islands and mainland, which are discovered and shall be discovered hereafter in said ocean, in the parts mentioned of the Indies, the inhabitants of all that country may be better governed, we give you such power, and *civil and criminal jurisdiction*," &c.

This *jurisdiction*, it will be recollected, was for the "better government of the inhabitants," when the only "inhabitants" were natives.

Queen Elizabeth's charter to Sir Humphrey Gilbert, authorised him, "at all times hereafter to discover, find, search out, and view such remote heathen and barbarous lands, countries, and territories, not actually possessed of any christian prince or people, as to him, his heirs and assigns, shall seem good, and the same to have, hold, occupy and enjoy, to him, his heirs, and assigns forever; with all commodities, *jurisdictions*, and royalties, by sea and land! And further, shall have, hold, and occupy all the *soil* of all such, &c., and of all cities, castles, towns, and villages in the same, with the rights, royalties, and *jurisdictions*," &c.

The one to Sir Walter Raleigh, grants "all the soil of all such lands, territories, and countries, to be discovered and possessed as aforesaid, and of all such cities, castles, towns, villages, and places in the same with the royalties, franchises, and jurisdictions," &c.

All the charters granted by the Kings of England, were equally ample. That to Massachusetts, gives authority "to take and to hold that part of New-England, &c. and all the islands, rivers, ports, havens, waters, fisheries, mines, minerals, jurisdictions," &c.

It thus appears that the different potentates of Europe, so far from regarding the Indian tribes as sovereign nations, whose jurisdiction within their dominions was sacred, paid no respect to their internal regulations, or even their right to the soil, but proceeded to distribute the land and to exercise their own jurisdiction, as they would have done had the Indians not existed.

The charter to Connecticut gives a general power to make war on, "and upon just causes to invade and destroy the *natives* or other enemies of the said colony." It must be borne in mind that this charter was granted before the settlement of Connecticut, and in contemplation of that event. I would ask, what is meant by the words "just causes." Had this chartered company any right, according to the opinion of those who deny the power of the State to pass the law in question, to set a foot on the lands of the sovereign nations who resided within the limits of the Connecticut grant, and who are therein denominated "the natives?" Suppose these "natives" had refused to sell an acre of their domains to the emigrants, but permitted them to land upon their coast, and they had proceeded to erect houses to dwell in, and open plantations for cultivation, without any express permission from their landlords, and these landlords had then requested them to leave their shores, declaring that they could not consent to receive them as inmates of their country, nor permit them to possess lands within their limits; what would have been the conduct of these "moderate puritans?" Would they have felt that they were aliens in a foreign empire, and bound to comply with the requisitions of the ruling powers? Or would they have treated the demand for their departure with contempt, and viewed any attempt to enforce it as "just cause for war?" In a word, would they not have considered themselves landlords and not tenants, and an attempt to dispossess them of the fruits of their industry and toil, as ample cause, not for war, (the charter does not use this term of equality when speaking of the resident Indians,) but "to

invade and destroy the natives?" And yet surely the kindness of the Indians, in extending hospitality to them in the first instance, instead of at once expelling them from their shores, could give no title to the territory which they occupied. It is a general regulation in civilized communities, that aliens shall not hold a fee simple title to land, and what is to prevent the sovereigns of the wilderness from adopting and enforcing the same policy? It appears to me absurd, that any sovereign should grant a large extent of country to a company and vest in them the fee in the soil, and extensive political privileges, uniformly including jurisdiction, over the natives of the country in express terms, when he believed that he had himself no right to exercise jurisdiction over the country nor ownership over the soil, and that both resided in distinct independent nations then inhabiting the granted territory. I know it is said, that these grants conveyed the ultimate fee, that they contemplated a purchase of the possession from the Indians, who were viewed as the rightful occupants, and who could not be dispossessed without their consent. But the whole history of the western world, contradicts this assertion. The Spaniards, the Dutch, the French, the English, all took possession of great part of the countries they discovered without regard to any title in the first inhabitants, and extended their settlements and territories as their wants required. The charters obtained by the early settlers, expressly granted the right of soil and jurisdiction, and meant what they said. A great part of Virginia, and of the other Southern States, and of Kentucky and Tennessee were taken possession of, not because the Indians agreed that it should be done, but because the whites

willed to do it. It is true, that most of the country, particularly in the two latter states, was ceded by treaties, but the cessions were generally made by treaties of peace at the termination of hostilities between the white and red man, which had been produced by the occupation of the lands of the latter by the former, and often relinquished a claim to that, great part of which had before been wrested from their possession. The authority "to invade and destroy the natives," conferred by the kings of England upon the colonists, carries irresistible proof to my mind, that the grantor considered himself lord and rightful sovereign of these domains. The power conferred was not to declare war, but "to invade and destroy," manifesting that no declaration of war was necessary, no conformity to the usages existing among civilized nations intended, no boundaries to be regarded, but the pursuit to be continued wherever the foe could be found, until this savage enemy was "destroyed." Would it not be a most extraordinary departure from all civilized usage, for one nation to authorise a part of its subjects "for just causes," of course to be determined on by them, "to invade and destroy," the citizens or subjects of a neighboring state, and would not such an act be justly viewed as hostile in its character?

The fact that by far the greater portion of the territory within the United States which has been obtained from the Indians, has been procured by purchase, can not weigh greatly in this investigation, when it is recollected, that the consideration paid for it, was always, until recently, merely nominal, and that true policy required that these fierce nations, which generally surrounded the settlements of the

whites on every side, except the one washed by the ocean, should be conciliated. Nor is the circumstance that they were, in early days, usually left under the government of their own peculiar customs, any argument against the right of the colonizing nations to exercise jurisdiction over them. No beneficial effect could have resulted from an effort of this kind, and its only tendency would have been to have aroused the jealousy of the Indians, and excited their combined efforts against their new neighbors, when thus informed that the whole country was considered as subject to their sway.

Additional light may be obtained on this subject of Indian privileges, by reference to a speech of Mr. Stuart, superintendent of Indian affairs, made to the Indians at Mobile, soon after the conclusion of peace in 1763. The following is an extract from that speech : "Lastly, I inform you that it is the King's order to all his governors and subjects, to treat the Indians with justice and humanity, and to forbear all encroachments on the territories allotted to them; accordingly all individuals are prohibited from purchasing any of your lands. But as you know that your white brethren can not feed you when you visit them, unless you give them ground to plant, it is expected that you will cede lands to the king for that purpose. But whenever you shall be pleased to surrender any of your territories to his majesty, it must be done, for the future, at a public meeting of your nation, when the governors of the provinces or the superintendent shall be present, and obtain the consent of all your people. The boundaries of your hunting grounds will be accurately fixed, and no settlement be permitted to be made upon them. As

you may be assured that all treaties with you will be faithfully kept, so it is expected, that you also, will be careful strictly to observe them."

Here the Indian "hunting grounds" are spoken of as being "allotted" to them by the King; a strange phraseology, if the King's lands were, in fact, to be allotted to him by the Indians. And so careful was this superintendent, lest he should compromit the rights of his master, that he used the expression "Indian hunting grounds," not "Indian lands." Is it not evident that he considered the Indians as occupying these lands for the purpose of hunting, by the permission, and at the discretion of the King. He has "allotted" them, laid off the boundaries, and although he will not permit his subjects to encroach on these "hunting grounds," and expects "the consent of all your people" when you agree to contract your limits, yet as your white brethren "will want ground to plant," it is expected that you cede "lands to the King for that purpose." The amount of all which, seems to be this.—The King has in kindness still permitted you to occupy these lands as hunting grounds. He is perfectly satisfied, that at the request of the governors of his provinces, or his superintendent, you will, for the merest trifle, agree to contract the limits of the country thus "allotted" to you, whenever his subjects may require more land for the extension of their settlements, and he is willing to give you this trifle, because it is much better to have your friendship on these terms, than to have your lands for nothing, but your enmity as the consequence. It may be said, that the Indians can not be presumed to have understood the peculiar meaning of the word "allotted," and, therefore, could

not have yielded any right or privilege by not objecting to the use of it. The inquiry, however, is not, how did the Indians understand this language, but how was it understood by the sovereign whose agent employed it? It has never been supposed that the wild savage tribes who inhabited this continent in the sixteenth and seventeenth centuries, considered their lands as the property, or themselves as the subjects of the different European powers who claimed them as such, nor did they doubt their right to treat and trade with whom they pleased; especially those who roamed at a distance from the white settlements. They had as little idea of the restraints which they are admitted to have been subject to, as any others. Can it be believed that the Cherokees of that day believed that the fee of their lands was vested in the King of Great Britain, subject only to their occupancy, and that he could make a valid grant of that fee even to the spot in the centre of the nation upon which they met to hold their counsels, to a citizen of London?

It is not our business to ascertain the opinions of the Indians as to the relative situation which they occupied to the European governments which planted colonies among them; but the understanding of the civilized world is what we wish to know.

The proclamation issued by the King of Great Britain in 1763, soon after the ratification of the articles of peace, contains the following sentence. "And we do further declare it to be our royal will and pleasure, *for the present*, to reserve under our sovereignty, protection, and *dominion*, for the use of the said Indians, all the lands and territories, lying to the westward of the sources of the rivers which

fall into the sea, from the west and north west as aforesaid."

There is contained in thess words the plain reservation of a right to determine the Indians "use" at pleasure. But be this as it may, there is a manifest declaration of sovereignty and *jurisdiction*. To be within the "dominion" is synonomous to being within the *government* or *jurisdiction* of the author of the proclamation.

I think I have shewn that the European monarchs who held colonies in the western world, considered themselves as having the right of the soil, but more especially of jurisdiction throughout their western dominions; and that they did not take actual possession of the lands and bring the Indians within the direct control of their civil tribunals, resulted alone from what was considered the dictate of true policy.

I come now, in the course which I have laid down for my government in this investigation, to an examination of the acts of some of the British colonial legislatures relative to the Indians, passed before the revolution. And I propose to embrace in this examination some of the statutes providing for the punishment of individual Indians for offences committed in the country occupied by the whites, with the view of ascertaining whether they were considered to be clothed with all the privileges of citizens or subjects of a foreign government, or were viewed as inferior beings, who from their savage nature, required a different measure of punishment from that which was meted to British subjects for similar offences. For if this be so, it will go far to prove in what light the colonists estimated Indian titles and Indian jurisdiction.

So early as the years 1660 and 1672, we find the colony of Massachusetts legislating on this subject. One of their first acts was "for settling the Indian title to lands in this jurisdiction." By this law it was provided, "That what lands any of the Indians in this jurisdiction have possessed and improved, by subduing the same, they have just right unto:

"And for the further encouragement of the hopeful work among them, for the civilizing and helping them forward to christianity, if any of the Indians shall be brought to civility and shall come among the English to inhabit in any of their plantations, and shall there live civilly and orderly, such Indians shall have allotments amongst the English, according to the custom of the English in like cases.

"No person shall sell, give, or barter, directly, or indirectly, any gun or guns, powder, bullets, shot or lead, to any Indian whatsoever, or to any person inhabiting out of this jurisdiction, nor shall any amend or repair any gun belonging to any Indian, nor shall sell any armour or weapons, upon penalty of ten pounds for every gun, &c."

"In subsequent acts the following provisions are contained: Whereas the French and Dutch and other foreign nations, do ordinarily trade guns, powder, and shot, with Indians, to our great prejudice, and strengthening and animating the Indians against us, and the aforesaid French, Dutch, &c. do prohibit all trade with the Indians within their respective jurisdictions, &c.

"It is therefore ordered: That it shall not be lawful for any Frenchman or Dutchman, or any person of any other foreign nation whatsoever, or any English, dwelling amongst them, to trade with any Indian

or Indians within the limits of our jurisdiction, under penalty of confiscation of all such goods and vessels as shall be found so trading, &c."

"And it shall be lawful for any person inhabiting within this jurisdiction, to make seizure of any such goods or vessel so trading with the Indians."

From these statutes it appears that Indians were prohibited from engaging in particular kinds of trade with any and every person whatever; that it was considered unsafe to permit them to have arms, and that a citizen was liable to a considerable penalty for furnishing them with even a pound of shot. But the one last extracted from, proves more than this. It shows that the trade of foreigners with the Indians, throughout the whole limits of the colony, was either regulated or interdicted as was deemed proper. For it cannot be supposed that the intention of the statute, was only to prohibit this trade in arms and ammunition within the settlements of the colony. It would have been folly to have supposed that foreigners would thus openly attempt to excite the hostility of the Indians towards the colonists. We, therefore, also learn from these extracts, that the term "jurisdiction," when used by the legislature of Massachusetts to express the extent of country over which it was exercised by the colony, included their whole chartered limits.

In the winter of 1693–4 an act was passed in the same colony, "for the better rule and government of the Indians in their several plantations." The object of the statute is declared to be, "That the Indians may be forwarded in civility and christianity, and that drunkenness and other vices may be more effectually suppressed among them."

By this law it is provided, "That his excellency the governor, by and with the advice and consent of the council, may, and is hereby empowered to appoint and commissionate one or more discreet persons within the several parts of this province, to have the inspection and more particular care and government of the Indians in their respective plantations; and to have, use, and exercise the power of a justice of the peace over them in all matters, civil and criminal, ss well for the hearing and determining of pleas betwixt party and party, and to award execution thereon, as for the examining, hearing, and punishing of criminal offences, according to the acts and laws of the province, &c.

"It shall and may be lawful for any person or persons to seize any wines, strong liquors, or cider, which he or they may find in the custody of any Indian, &c.

"Every Indian convicted of drunkenness, shall suffer and pay, unto the use of the poor of the town or place where such offence is committed, the sum of five shillings, or else be openly whipped by the constable of such town or place, not exceeding ten lashes."

This statute at least proves that the Indians were measured by a rule different from that which was applied to the rest of the population. The most degrading punishment is to be inflicted upon one of them for the slightest misdemeanor: public whipping for intoxication, which offence when committed by a white man was followed by a very different punishment. What would have been thought of a law which made such a distinction between the provincials, and the subjects of the King of France

or of Spain? It would not have been tolerated. And yet it is urged that never until this day have the Indians been received as other than sovereign nations, collectively and individually possessing all the rights and privileges which appertain to the citizens of such nations, and entitled in other countries than their own, to all the comity and respect which would be extended to the subjects of the proudest potentate of Europe. We see, however, that the "moderate puritans" of Massachusetts Bay, viewed them as savages and outlaws, who, while they wished to civilize and reclaim them, were to be punished in the most ignominious manner for the slightest offences and to be restrained from crime, like the slave, not by incitements to good, but by the terror of the suspended whip. It cannot be believed that a people thus singled out for infamous punishment, thus subject to have the spirits, the wines, &c., which they had purchased, and of course any other articles which the legislature might have chosen to add to the catalogue, arrested from them by every petty constable; were considered as possessing all the privileges of citizens of sovereign independent communities. They were found roving bands of savages by our ancestors, who first settled the American wilderness, governed entirely by their passions, and giving a full sweep to every appetite without regard to consequences. They could not be induced to forbearance from those gratifications of the animal appetite, so destructive in their consequences, by the incentives usually addressed to the civilized man. They were treated as a peculiar people, distinct laws were enacted to govern and control them, they were addressed through their fears, and while every induce-

51

ment was held out to them to change their mode of life, to give up their habits of indolence and depen- dence upon the chase, and to apply themselves to agriculture and the arts; the slightest offences brought upon them the degrading punishment of the lash; most degrading when inflicted upon the white man, and never prescribed except for the most hei- nous crime : but the Indian neither felt nor feared the disgrace, the bodily pain alone was the object of terror to him.

We have evidence amounting to demonstration of the opinion entertained by the legislature of the pro- vince of Massachusetts Bay, of the situation which the Indian tribes within the limits of their charter occupied, in relation to the government of Great Britain, in the preamble to a statute passed in 1725. It is in the following language : "Whereas the In- dians in the eastern part of the province, having been some years past in hostilities and *rebellion*, have now submitted themselves, and recognized their subjection and obedience to the crown of Great Britain," &c. They are stated to have been in "rebellion." Who are rebels? Those who, owing obedience, take up arms against a government. Can the members of an independent nation be guilty of "rebellion," by en- gaging in "hostilities" with another independent na- tion? I presume this will not be contended. Among all the sovereign states treated of by the writers on national law, not one of the stronger or weaker, the protector or protected, whether united by alliance, league, or confederacy, is declared to be guilty of *re- bellion* by taking up arms against the other. Rebel- lion implies allegiance, and if there has been no alle- giance, there can be no rebellion. Yet here the

tribes who had never been brought into actual sub-
jection, as is obvious from the phraseology, who had
not hitherto received the justices of the peace and
constables which the governor, under the paternal
provisions of the laws, was authorised to appoint;
who had never submitted themselves to the fatherly
chastisement of the whip for getting drunk, who, as
to any actual restraint, have been as free as their
own native wilds, are declared to have been *rebels*.
If rebels, they had surely been guilty of treason;
and as traitors, might have been tried, condemned, and
executed upon their submission, but for the mercy of
*their* sovereign against whom they had offended.

The statutes of Connecticut keep pace with, and
are, in almost all respects, similar to those of Massa-
chusetts. The laws of that province also, restrained
the intercourse and trade between the Indians and
whites; prohibited the latter from selling or giving
to the former spirituous liquors, &c., prescribed the
punishment of whipping to be inflicted upon an In-
dian for drunkenness, and declared the great objects
in view to be the christianizing and civilizing the
sons of the forest, and to induce them to give up the
chase and turn their attention to agriculture.

The other colonies of New England exercised
similar powers, but it is deemed unnecessary to make
special reference to any of the statutes.

I might multiply quotations similar to those which
I have made from the laws of Massachusetts, from
the statutes of every colony which afterwards formed
the thirteen United States, but I will content myself
with a reference to some of the acts passed in Vir-
ginia.

In the year 1658, the legislature of that province

enacted, "That there be no grants of land to any Englishman whatsoever (*de futuro*) until the Indians be first served with the proportion of fifty acres of land for each bowman; and the proportion of each particular town to lie together, and to be surveyed as well woodland as cleared ground; and to be laid out before patented, with liberty of all waste and un-fenced, lands for huntiug for the Indians."

Again—"Whereas many complaints have been brought to this assembly, touching wrong done to the Iudians, in taking away their land, and forcing them into such narrow straits and places, that they cannot subsist either by planting or hunting, &c.—Be it enact-ed, that all the Indians of this colony shall and may hold and keep those seats of land which they now have; and that no person or persons whatsoever, be suffered to intrench or plant upon such places as the said Indians claim or desire, until full leave from the governor and council."

Here full power is recognised in the governor and council to deprive the Indians of the places they oc-cupied, nor is the land restored which it is acknow-ledged had been taken from them.

In 1660, the following law was passed in the same colony :—"Whereas, the Indians of the Accomack have complained that they are very much straitened for the want of land, and that the English seat so near them, that they receive very much damage in their corn. It is ordered that the right honorable the governor give commission to two or three gentle-men, with a surveyor living on this side of the bay (that have no relation to Accomack) to go over thither, and lay out such a portion of lands for the said In-dians as shall be sufficient for maintenance, with hunting and fishing excluded; and the land so laid

out, to be so secured to the Indians, that they may have no power to alienate it, or any part of it, hereafter, to the English."

In 1665, the same colony enacted, that, "Whereas, at a Grand Assembly, held at James City, September 10, 1663, it was provided that where any murder was committed by the Indians upon the English, the next turn of the Indians was to use their utmost endeavors for discovering the actors and doers thereof, and in regard the same act was only limited to the northern Indians," this proceeds to make the provision general. Another section is as follows: "That the said Indians shall not have power within themselves to elect or constitute their own Werowance or chief commander, but the present honorable governor and his successors from time to time, shall constitute and authorise such persons in whose fidelity they may find the greatest cause to repose a confidence, to be the commander of the respective towns: and in case the Indians shall refuse their obedience to, or murder such persons, then that nation so refusing or offending, be accounted enemies and rebels, and to be proceeded against accordingly."

Here is evidently an innovation upon the internal regulations of the Indians, and, in fact, an abrogation of their civil institutions and customs. These must have prevailed before, and their "Werowance or commanding chief," have been constituted by their own appointment; else why the apprehension that those appointed under this statute will not be received by them?

I think enough has been said on this part of the subject to satisfy an impartial mind that neither the sovereigns of Europe who held possessions in Ameri-

ca, nor the colonial legislatures, doubted their right to embrace within the jurisdiction of their courts, any Indian tribes who were situated as to make it expedient to do so. Doubtless at the date of many of the statutes which were passed in the colonies for the government and regulation of the Indians, some of the nations had been so much reduced in limits and numbers as to bring their whole country within the immediate neighborhood of the whites, and to render it perfectly convenient, and every way desirable, to embrace them directly within the operation of the laws. In Virginia, it would appear, that the territories of many of the tribes were gradually intruded upon by the colonists until the Indians had not land enough left to answer their own demands for the purposes of agriculture, hunting, &c., and the legislature was compelled frequently to interfere to prevent their entire expulsion from the home of their fathers. For it cannot be supposed that regular cessions had been made of all the country which these Indians inhabited, who were the objects of the care of the legislature; if so, they, as do the red men of modern times, would have left the country they had parted from by treaty, and sought other places of habitation. But this was not their situation. The increasing numbers and advancing improvements of the colonists required the extension of their borders, and they pressed into the Indian countries around them as their wants required; thus we find the European and the aboriginal American inhabitants of the same country, and the possessions of the latter diminishing while those of the former are enlarging.

I will now give a cursory examination to some of the judicial decisions of different courts within the

United States, so far as they bear upon this question.

In the celebrated case of *Fletcher* vs. *Peck*,[a] before the Supreme Court of the United States, the learned Counsels for the defendants used the following argument, in which, so far as the opinion embraces it, they were sustained by the court.

a6 Cranch 87

" The right of disposing of the lands belonging to the state, naturally devolved upon the legislative body, who were to enact such laws as would authorise the sale and conveyance of them.

" A doubt has been suggested whether this power extends to lands to which the Indian title has not been extinguished. What is the Indian title? It is a mere occupancy for the purpose of hunting. It is not like our tenures; they have no idea of a title to the soil itself. It is overrun by them rather than inhabited. It is not a true and legal possession. It is a right not to be *transferred,* but *extinguished.* It is a right regulated by treaties, not by deeds of conveyance. It depends upon the law of nations, not upon municipal right. Georgia had a right to sell, subject to the Indian claim.

" Europeans found the territory in possession of a rude and uncivilized people, consisting of separate and independent nations. They had no idea of property in the soil, but a right of occupation. A right, not individual, but national. This is the right gained by conquest. *The Europeans always claimed and exercised the right of conquest over the soil. They allowed the former occupants a part, and took to themselves what was not wanted by the natives.* Even Penn claimed under the right of conquest. He took under a charter from the King of England, whose right was the right of conquest. All the trea-

ties with the Indians were the effects of conquest. All the extensive grants have been forced from them by successful war. The conquerors permitted the conquered tribes to occupy part of the conquered land until it should be wanted for the use of the conquerors. Hence the acts of legislation fixing the lines and bounds of the Indian claims; hence the prohibition of Indian purchases," &c.

Chief Justice Marshal, in the opinion delivered in that case, said, "the majority of the court (Judge Johnson dissented) is of opinion that the nature of the Indian title, which is certainly to be respected by all courts, until it be legitimately extinguished, is not such as to be absolutely repugnant to *seisin* in fee on the part of the state."

By "the right of conquest," nothing more is in fact meant than the right of discovery. It was " the right of discovery" as to the civilized world, " the right of conquest" as to the Indians themselves. True, but a small part of the country had actually been conquered; many of the wandering tribes, who lived at a great distance from the sea-board, had scarcely heard that a new race had landed from the ocean; the thunders of European artillery had never reached their ears; and utterly astonished would they have been, to have learned that Kings and States General beyond the Atlantic, claimed the sovereignty over them and their lands, and made this claim as their conquerors. Yet doubtless this claim was made, because the nations asserting it intended making it true, if their pretensions were opposed by resistance. If the Indians had opposed the landing of the Europeans on their shores, and rejected all their propositions for a peaceful surrender of their lands, there

would have been conquest in fact instead of in name only, and such, some of the tribes, who refused to cede by treaty, found to be their fate.

The effect of acquisition by conquest is, to vest all the national rights of the conquered, in the conqueror, and because all right to the soil among Indian tribes was national, none individual, the right of soil, as well as of sovereignty, passed to the conqueror. The conquerors "took to themselves what was not wanted by the natives." Can we suppose they would be more scrupulous about assuming jurisdiction, than a right to, and, often, possession of the soil?

In the case of *Johnson* vs. *McIntosh*,[a] the power of an Indian tribe, while enjoying all the independence and sovereignty it ever possessed since the white man first put foot upon their territory, to sell and convey land to an individual and clothe him with the fee simple title, was the subject of controversy. The plaintiff was a grantee of the Indians and the defendant of the United States; the government having purchased from the Indians subsequent to their grant to the plaintiff. I shall give some extracts from the argument in that case, because it contains a lucid and clear exposition of the relative situation of the Indian and the white man, of the jurisdiction inherent in the native tribes and the discovering state. That argument, so far as I shall refer to it, was in the following language: "The uniform understanding and practice of European nations, and the settled law, as laid down by the tribunals of civilized states, denied the right of the Indians to be considered as independent communities, having a permanent property in the soil, capable of alienation to private

*8 Wheat. 542.*

individuals.    They remain in a state of nature, and have never been admitted into the society of nations. All the treaties and negotiations between the civilized powers of Europe and of this continent, from the treaty of Utrecht, in 1713, to that of Ghent, in 1814, have uniformly disregarded their supposed right to the territory included within the jurisdictional limits of those powers.    Not only has the practice of all civilized nations been in conformity with this doctrine, but the whole theory of their titles to lands in America, rests upon the hypothesis, that the Indians had no right of soil as sovereign, independent states. Discovery is the foundation of title in European nations, and this overlooks all proprietary rights in the natives.    The sovereignty and eminent domain thus acquired, necessarily precludes the idea of any other sovereignty existing within the same limits.    Even if it should be admitted that the Indians were originally an independent people, they have ceased to be so.    A nation thus having passed under the dominion of another, is no longer a sovereign state.    They are subject to the sovereignty of the United States.    *The subjection proceeds from their residence within our territory and jurisdiction.*    They are of that class who are said by jurists not to be citizens, but perpetual inhabitants with diminutive rights.    The statutes of Virginia, and all of the other states, and of the United States, treat them as an inferior race of people, without the privileges of citizens, and under the perpetual protection and pupilage of the government.    The measure of property acquired by occupancy is determined, according to the law of nature, by the extent of men's wants, and their capacity of using it to supply them.    It is a violation of

the rights of others to exclude them from the use of what we do not want, and they have an occasion for. Upon this principle, the North American Indians could have acquired no proprietary interest in the vast tracts of territory which they had wandered over, and their right to the lands on which they hunted, could not be considered as superior to that which is acquired to the sea by fishing in it. The use in the one case, as well as the other, is not exclusive. According to every theory of property, the Indians had no individual rights to land; nor had they any collectively, or in their national capacity : for the lands occupied by each tribe, were not used by them in such a manner, as to prevent their being appropriated by a people of cultivators. All the proprietary rights of civilized nations on this continent are founded on this principle. The right derived from discovery and conquest, can rest on no other basis; and all existing titles depend on the fundamental title by discovery." In delivering the opinion of the court in the same case, Chief Justice Marshall says: "As the right of society, to prescribe those rules by which property may be acquired and preserved, is not and cannot be drawn into question; as the title to lands, especially, is and must be admitted to depend entirely on the law of the nation in which they lie; it will be ne cessary, in pursuing this inquiry, to examine, not singly those principles of abstract justice, which the Creator of all things has impressed on the mind of his creature man, and which are admitted to regulate, in a great degree, the rights of civilized nations, whose perfect independence is acknowledged; but those principles also which our own government has

adopted in the particular case, and given us as the rule of our decision.

On the discovery of this immense continent, the great nations of Europe were eager to appropriate to themselves so much of it as they could respectively acquire. Its vast extent offered an ample field to the ambition and enterprise of all; and the character and religion of its inhabitants afforded an apology for considering them as a people over whom the superior genius of Europe might claim an ascendency. The potentates of the world found no difficulty in convincing themselves that they made ample compensation to the inhabitants of the new, by bestowing on them civilization and christianity, in exchange for unlimited independence. But, as they were all in pursuit of the same object, it was necessary, in order to avoid conflicting settlements, and consequent war with each other, to establish a principle, which all should acknowledge as the law by which the right of acquisition, which they all asserted, should be regulated as between themselves. This principle was, that discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession."

"Those relations which were to exist between the discoverer and the natives, were to be regulated by themselves. The rights thus acquired being exclusive, no other power could interpose between them.

"While the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to be in themselves; and claimed and exercised, as a conveyance of this ultimate

dominion, a power to grant the soil, while yet in possession of the natives."

Again—"The United States have unequivocally acceded to that great and broad rule by which its civilized inhabitants now hold this country. They hold, and assert in themselves, the title by which it was acquired. They maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title of occupancy, either by purchase or by conquest; *and gave also a right to such a degree of sovereignty, as the circumstances of the people would allow them to exercise.*"

With respect to the "relations which existed between the discoverers and the natives," the Chief Justice says, "We will not enter into the controversy, whether agriculturists, merchants and manufacturers, have a right, on abstract principles, to expel hunters from the territory they possess, or to contract their limits. Conquest gives a title which the courts of the conqueror cannot deny, whatever the private and speculative opinions of individuals may be, respecting the original justice of the claim which has been successfully asserted. The British government, which was then our government, and whose rights have passed to the United States, asserted a title to all the lands occupied by the Indians, within the chartered limits of the British colonies. It asserted also a limited sovereignty over them, and the exclusive right of extinguishing the title which occupancy gave to them. These claims have been maintained and established as far west as the Mississippi, by the sword. The title to a vast portion of the lands we now hold, originates in them. It is not for the courts of this country to question the validity of this

title, or to sustain one which is incompatible with it.

"Although we do not mean to engage in the defence of those principles which Europeans have applied to Indian title, they may, we think, find some excuse, if not justification, in the character and habits of the people whose rights have been wrested from them.

"The title by conquest is acquired and maintained by force. The conqueror prescribes its limits. Humanity, however, acting on public opinion, has established, as a general rule, that the conquered shall not be wantonly oppressed, and that their condition shall remain as eligible as is compatible with the objects of the conquest. Most usually, they are incorporated with the victorious nation, and become subjects or citizens of the government with which they are connected. Where this incorporation is practicable, humanity demands, and a wise policy requires, that the rights of the conquered to property should remain unimpaired; that the new subjects should be governed as equitably as the old.

"But the tribes of Indians inhabiting this country were fierce savages, whose occupation was war, and whose subsistence was drawn chiefly from the forest. To leave them in possession of their country, was to leave the country a wilderness; to govern them as a distinct people, was impossible, because they were as brave and as high spirited as' they were fierce, and were ready to repel by arms, every attempt on their independence. What was the inevitable consequence of this state of things? The Europeans were under the necessity of either abandoning the country, and relinquishing their pompous claims to it, or of enforcing those claims by the sword, and by the

adoption of principles adapted to the condition of a people with whom it was impossible to mix, and who could not be governed as a distinct society ; or of remaining in their neighborhood, and exposing themselves and their families to the perpetual hazard of being massacred.

"Frequent and bloody wars, in which the whites were not always the aggressors, unavoidably ensued. European policy, numbers, and skill prevailed. As the white population advanced, that of the Indians necessarily receded. The country in the immediate neighborhood of agriculturists became unfit for them. The soil, to which the crown originally claimed title, being no longer occupied by its ancient inhabitants, was parcelled out according to the will of the sovereign power, and taken possession of by persons who claimed immediately from the crown, or mediately, through its grantees or deputies.

"However extravagant the pretension of converting the discovery of an inhabited country into conquest, may appear ; if the principle has been asserted in the first instance, and afterwards sustained ; if a country has been acquired and held under it ; if the property of the great mass of the community originates in it, it becomes the law of the land, and cannot be questioned."

Comment upon the foregoing extracts, from both the argument and opinion, would seem to be unnecessary. The plain positions taken by counsel and sustained by the court are, that discovery and conquest, as they relate to the title to the lands of the North American continent, are convertible terms, the one applicable to the other civilized powers ; the other to the natives. That the European power, whose sub-

jects or citizens made the discovery, was acknowledged the sovereign of the territory thus discovered, *from the fact of the discovery*, by every other nation in Europe, and considered the natives as a conquered people; although from the numbers, the fierceness and warlike character of the Indians, actual possession was obtained by these new masters in the manner deemed most politic; sometimes by gradual encroachment; sometimes by what was termed a purchase, though the consideration was always very inadequate, in most instances merely nominal; and sometimes by the sword. The title in fee to the soil, even while the possession remained in the Indians, was universally admitted to be vested in the discovering state; was so recognised in this case of *Johnson* vs. *McIntosh*, and was granted either to individuals or companies, as was thought proper, and the grantees always adjudged, by every court, to hold an indefeasible estate, notwithstanding it was not convenient for the possession to accompany the grant.

And what was the situation of the sovereignty or jurisdiction? Did it not stand in precisely the same predicament? The cases to which we have referred uniformly treat the "dominion" as in the European state. It is true, actual jurisdiction was not exercised over all these erratic people, and why was it not? Because it was not politic or convenient to exercise it; but as fast as the circumstances of the whites would allow them to exercise it, it was done.

In support of these positions, especially as to the right of jurisdiction, I would refer, also, to the able opinion of Justice Baldwin, in the celebrated case of " *The Cherokee Nation* vs. *the State of Georgia*," decided in the Supreme Court of the United States in

January, 1831. He says, "While dependent themselves (the colonies) on the crown, they exercised all the rights of dominion and sovereignty over the territory occupied by the Indians; and this is the first assertion by them of rights as a foreign state, within the limits of a state. If their jurisdiction within their boundaries has been unquestioned until this controversy; if rights have been exercised which are directly repugnant to those claimed; the judicial power cannot divest the states of rights of sovereignty, and transfer them to the Indians, by decreeing them to be a nation, or foreign state, pre-existing, and with rightful jurisdiction and sovereignty over the territory they occupy. This would reverse every principle on which our government has acted for forty-five years; and force, by mere judicial power, upon the other departments of this government, and states of this Union, the recognition of the existence of nations and states within the limits of both, possessing dominion and jurisdiction paramount to the Federal and State Constitutions. It will be a declaration, in my deliberate judgment, that the sovereign power of the people of the United States and Union, must hereafter remain incapable of action over territory to which their rights in full dominion have been asserted with the most rigorous authority, and bow to a jurisdiction hitherto unknown, unacknowledged by any department of the government; denied by all, through all time; unclaimed till now; and now declared to have been called into exercise, not by any change in our Constitution, the laws of the Union, or the states; but pre-existent and paramount over the supreme law of the land."

Happily for us, although two members were in favor of doing so, the court did not make a decision, the consequences inevitably resulting from which were thus clearly portrayed by this able jurist.

*20 Johns. Rep. 188. In the case of *Jackson* vs. *Goodell*, in the Supreme Court of New York, Chief Justice Spencer, in his opinion, uses the following language: " These Indians are born in allegiance to the government of this state, for our jurisdiction extends to every part of the state.   We do not mean to say, that the condition of the Indian tribes, at former and remote periods, has been that of subjects or citizens of the state. Their condition has been gradually changing until they have lost every attribute of sovereignty, and become entirely dependent upon, and subject to our government.   *I know of no half way doctrine on this subject.*   We either have an exclusive jurisdiction, pervading every part of the state, including the territory held by the Indians, or we have no jurisdiction over their lands, or over them, whilst acting within their reservations.   It cannot be a divided empire; it must be exclusive as regards them or us."

Have we not in all these cases, clear proof, that, in the understanding of all the civilized world, a discovered Indian country was a conquered country : that the new sovereign always so considered it, and exercised the rights of a conqueror over his new subjects?   The English monarchs generally used moderation towards the natives, it is true, but this was prompted by policy and humanity, and a just regard to the opinion of mankind.   And is the judiciary to overturn the political course of the country, and by an investigation, not of law and precedent, but of abstract right, to determine that all this course of

policy has been wrong, and not only wrong, but illegal? Never can I assume such responsibility. It is not for the Courts, no matter what may be their opinion on abstract right, to interfere. In the language of Chief Justice Marshal, "however extravagant the pretension of converting the discovery of an inhabited country into conquest may appear; if the principle has been asserted in the first instance, and afterwards sustained; if a country has been acquired and held under it; if the property of the great mass of the community originates in it, it becomes the law of the land, and cannot be questioned."

I will refer to one other decision of the Supreme Court of New York, and close this part of the case.

About the year 1828, Soo-non-gize, otherwise called Tommy-Jemmy, a Seneca chief, was indicted for the murder of an Indian woman of the same tribe. It appeared in evidence on the trial, that this woman had been charged with an offence, which, according to the usages of that tribe, was capital. The offence was charged to have been committed by her in the Seneca country, within the state of New York, and she was there tried, according to their mode, found guilty, and executed. Tommy-Jemmy was the chief who conducted the trial, and ordered the execution. For this act, he was arraigned before one of the Courts of New York, and, notwithstanding all these facts were admitted, was convicted and sentence of death pronounced against him. The case was carried to the Supreme Court of the State, by which the judgment was affirmed. It is true, he was not executed, a pardon having been extended to him by the General Assembly. This statute, however, did not proceed upon the ground that the Courts had ex-

ceeded their authority in taking the jurisdiction; far from it, the right of jurisdiction was expressly recognized. The statute was as follows: " Whereas, the Seneca and other tribes of Indians, residing within this state, have assumed the power and authority of trying and punishing, and in some cases capitally, members of their respective tribes, for supposed crimes by them done and committed in their respective reservations, and within this state: and whereas the sole and exclusive cognizance of all crimes and offences committed within this state, belongs of right to courts holden under the constitution and laws thereof, as a necessary attribute of sovereignty, excepting only crimes and offences cognizable in the Courts deriving jurisdiction under the constitution and laws of the United States: and whereas, it has become necessary, as well to protect the said Indian tribes, as to assert and maintain the jurisdiction of the courts of this state, that provision should be made in the premises:

" *Therefore, Be it enacted,* That the sole and exclusive jurisdiction of trying and punishing all and every person, of whatsoever nation or tribe, for crimes and offences committed within any part of this state, except only such crimes and offences as are, or may be, cognizable in courts deriving jurisdiction under the constitution and laws of the United States, of right belong to, and is exclusively vested in, the courts of justice of this state, &c.

"And whereas, it has been represented, that Soonon-gize, otherwise called Tommy-Jemmy, an Indian of the Seneca tribe, has been indicted for the murder of Caughquawtaugh, an Indian woman of the same tribe, which murder is alleged to have been commit-

ted within the Seneca reservation, in the county of Erie; and whereas it is further represented that said murder was committed under the pretence of authority derived from the councils of the chiefs, sachems, and warriors of the said tribe; and under the then existing circumstances, it is deemed by the legislature expedient to pardon him.

" *Therefore, Be it further enacted*, That the said Soo-non-gize, otherwise called Tommy-Jemmy, be, and he is hereby fully and absolutely pardoned of and from said felony."

Such is the language of this statute, and such were the judgments of the inferior and Supreme Courts of New York; in neither of which it was ever for a moment supposed the respective departments, or either of them, exceeded their powers. The legislature of that state, in this act, asserts the jurisdiction of their Courts over its whole limits, and that the powers which the Indians exercised, of punishing under their own laws, for offences committed among themselves, was an "assumed power." Will it be said that the Senecas, and other tribes within that state, live on "*reservations*" within the counties of the state, and therefore must be subject to its laws! I ask, what difference can this possibly make? They still constitute distinct tribes or nations, inhabiting lands which they have never ceded. The word "reservation," as applied to Indian country, simply means lands which they did not part from when they sold or otherwise yielded up the rest of their territory. They made these reservations as communities or nations, they occupy them as nations, and whether they be many or few in number, whether their country be more or less extensive, they have all the rights

which pertain to an Indian tribe. Their being embraced in counties laid out by the state, can make no difference in *their* rights; if so, the Alabama statute receives all the aid which this circumstance can give it: but this act of the state cannot affect their right to independence. Yet, while each tribe still lived together as one people, the Courts of New York consider them within their jurisdiction without the aid of a statute.

Is not Alabama as sovereign as New York, and do not the Creeks occupy to this state, the same situation which the Senecas do to that? The Creeks live upon lands which they reserved when they ceded the rest of their territory; our counties embrace the whole of the country they inhabit, and, if the doctrine of the legislature and Supreme Court of New York be sound, it would be "assumed power" in the Creeks to try and punish members of their tribe under any authority derived from their chiefs, &c. "The sole and exclusive cognizance of crimes and offences committed within this state, belongs of right to Courts holden under the constitution and laws thereof, as a necessary attribute of sovereignty."

It is not the extent of country which forms an independent state, but it is the exercise of that independence.

Vattel, (page 58) says, "every nation that governs itself under what form soever, without any dependence on a foreign power, is a sovereign state." So that one of the Hanse towns, although surrounded by the dominions of a neighboring monarch, constituted a sovereign state, because governed by its own authority and laws.

There is no instance of a civilized state having

been considered as forfeiting its sovereignty, from the circumstance of having lost, by the chances of war, a part of its possessions, much less from having ceded it by treaty. If the Indian tribes ever were independent of the states in which they lived; if at any time the states had no authority to extend their jurisdiction over them, they continued independent while having a common " habitation and a name," no matter how greatly reduced in numbers or importance, and all the old states have committed aggressions upon them by interfering with their internal policy.

By what right did Massachusetts, Connecticut, New York, Virginia, in fine, all the colonies, forbid individuals from purchasing lands from the Indians, if they were sovereign nations? Had they not as much right to invite emigrants among them; to offer inducements to the settlement and cultivation of their immense territories; to embrace within their bosom, and cover with the protection of their institutions and jurisdiction, those who were thus drawn to their country, as any other people? Yet it appears never to have entered the minds of either white or red, that settlers upon Indian lands became Indian citizens, and were covered by the panoply of Indian law. Surely as one of these sovereigns, an emigrant might have secured to himself such right as the rest possessed, to the use of the spot which he cultivated while he lived upon it: but no; all contracts of individuals with the Indians for their lands, were declared void, by a power which, according to the modern doctrine, had no jurisdiction over those lands.

But when the substance of things is looked to, is it not most absurd to talk about the *purchases* which the early settlers made of Indian lands? By the

statutes of Massachusetts, &c., all contracts, agreements, &c., made with an Indian are declared to be void.* These people, chiefs and all, are like infants, pronounced incapable of protecting their own interests. Yet these persons, who have not a sufficient capacity to be permitted to make a binding contract to the amount of a dollar, are intelligent enough fully to estimate their national interests; to meet the learned and wily European as diplomatists, make treaties by which they are again and again yielding up millions of acres of fertile land, and all this is done on terms perfectly reciprocal! A few strings of red beads, a hogshead or two of tobacco, with a bale or two of coarse cloth, form an ample consideration, when given by *treaty*, for any extent of country which the cupidity of the white man might induce him to

---

*Extract from act of Massachusetts passed in 1805. Sec. 3d. "From and after the passing of this act, no bond, bill, or other specialty in writing, *or any contract whatever*, nor any book account, or verbal contract, or promise for the payment of money, shall be deemed good and recoverable against any of the said Indians, if the same shall not exceed the sum of four dollars, unless such bill, bond, specialty, or verbal contract, shall be approved by one at least of said guardians."

Act of Connecticut of 1725. "No person shall be allowed or admitted to prosecute before any assistant, or justice of the peace, or court of judicature in this colony, any action of debt or detinue, for any goods, sold, lent, or trusted out, to any Indian or Indians whomsoever."

Act of Rhode Island, 1718. "From and after the publication of this act, no process shall be granted, nor suit be received or lie before any justice or justices of the peace, assistants of courts of trials in this colony, against any Indian or Indians for debt to be made or contracted by such Indian or Indians, at any time after the publication hereof."

Act of New York 1813. "No person shall sue or maintain any action on any bond, bill, note, promise, or other contract, hereafter to be made against any of the Indians, called the Stockbridge Indians, or of the Seneca tribe or nation, nor against any Indian residing in Brothertown, or on any lands reserved to the Oneida, Onondaga, or Cayuga Indians, &c."

Acts were passed by all the colonies, rendering void any contract for lands made by a white man with an Indian or Indians.

ask, and the ignorance of the red man cause him to sell!

If this be the real state of the case, let these unholy acquisitions be immediately surrendered; let the remnants of the once numerous and powerful, but ignorant tribes, be collected together, and honestly told that our ancestors have used their superior knowledge to cheat and defraud them; we now wish to do them justice by giving back all that extensive domain which has been thus iniquitously occupied. Let us make restitution; the rents and profits will amply compensate us for first cost and improvements.

But if we believe these "roving bands" did not *use* the country they "*overran*," that, finding it in a state of nature, our forefathers were justifiable in clearing away the forests and cultivating the fields formed by their industry, and in bringing the Indians into subordination to them by the best means which policy and humanity dictated; let us continue to act in the same way, and while we enjoy the rich returns which Providence blesses our labors in this fertile region, let us do all that we can to civilize, christrianize, and perpetuate the Indians who remain among us.

After a patient and laborious investigation, I can find nothing, either in ancient charters; the conduct of any European power, or the opinion of any respectable writer of older date than 1825, which tends in the remotest degree to countenance the opinion that the Indian tribes have ever been considered as distinct and independent communities. In the language of Chief Justice Marshall, in the case of *Johnson* vs. *McIntosh*, "discovery gave an exclusive right to extinguish the Indian title of occupancy

either by purchase or conquest; and gave them" (the discoverers) "also, a right to such a degree of sovereignty as the circumstances of the people would allow them to exercise." "The circumstances of the people" did not "allow them to exercise" jurisdiction over many of the tribes within the limits of the colonies at an early day." Those tribes lived beyond their reach or control, and wandered over immense forests which the people of the colonies never had penetrated, and within and beyond which, they had no intercourse. But so fast as these forests disappeared before their extending settlements, and those once distant tribes were brought within reach of the laws, and in contact with the settlements of their civilized and more powerful neighbors; so far, in fine, "as the circumstances of the people would allow them to exercise" jurisdiction and sovereignty over their persons and their country; thus fast they were brought under the influence of those laws, and compelled to yield to that jurisdiction and sovereignty.

Whenever the Indians residing within the chartered limits of a colony, have made war upon it, they have been declared *rebels*, and their "destruction" authorised. No declaration of war has ever been made against them from their earliest history; and by the constant practice of the federal government, since the adoption of the constitution of the United States, the President has ordered troops against them, including those nations with which treaties have been made, without waiting for any movement in Congress on the subject, and his authority to do so has never yet been questioned. From the earliest day, we are informed by Douglass in his history of the British

settlements in North America, "when the country
of the Indians at war with us lies upon our own fron-
tier, but without our grants, I call it a war, in the
common acceptation; if within our grants, but with-
out our settlements, I call it an eruption; in our pro-
clamations against them, it is called a rebellion, as in
all the New England wars with the aborigines; if
intermixed with our settlements, it is an insurrection."

It might be well in taking leave of this part of the
cause, to look for a moment at the consequences which
would result from a decision adverse to the constitu-
tionality of the law. Not that consequences would
ever authorise a Court to shrink from its duty; but
they should always have their influence where the
law of a case is doubtful.

If this state has not the right to exercise jurisdic-
tion over the Creek nation *now*, when will it have the
right? Some tell us, whenever the number of that
people dwindles down to a few hundreds, or the ex-
tent of their country to a small compass. But sup-
pose one of these events were to take place without
the other: the number of the tribe is reduced to in-
significance, but they retain all their territory; or
they cede three fourths or nine tenths of their coun-
try, but their population, instead of diminishing, in-
creases; what is the consequence of this state of
things? How would it be were they to establish a
code of written laws, divide their lands into small
tracts, and convey them to the individuals of their
nation in fee simple? Are they to be permitted to
form such a government among us, and to adopt a
policy calculated to make this state of things perpetual?
Besides, what then is to become of the paramount
title to these lands, so often decided by the Supreme

Court of the United States, to reside in the general government?

It is obvious that unless the act of the General Assembly which we are now considering, can be carried into execution, the Creek Indians, may establish and maintain a separate government forever, and the State of Alabama would have within its borders another and a distinct sovereignty; an *imperium in emperio.*

Where such consequences would ensue, something must be wrong, and the error would be in the decision producing them.

The second question which presents itself is; have not the states, since the declaration of independence, all the powers on this subject, which the King of Great Britain had before, except so far as they have surrendered them to the United States?

This has never been controverted. The states by that event, became sovereign and independent, and clothed with all the privileges and powers of sovereign nations. Among the powers essential to sovereignty is that of jusisdiction. Let us inquire, have the states, by the adoption of the federal constitution, relinquished their right of jurisdiction over the Indians within their limits?

By the tenth article of the amendments of the Constitution it is declared, that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.

Have the states delegated their right to jurisdiction over the Indian tribes?

The word Indian is used only twice in the Constitution.—In the 2nd section of the 1st article, it is pro-

vided, that "representatives and direct taxes shall be appointed among the several states which may be included within this union, according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and *excluding Indians not taxed*, three fifths of all other persons."

Here certainly is no delegation of power to the United States, but rather an expres recognition of the rights and sovereignty of the states, over the aborigines. So far as Indians are taxed, they are, in express terms included in apportioning representatives, and viewed as inhabitants of the states, because the apportionment is directed to be made according to the population of the states; but words of exclusion are used with respect to those not taxed; which could only have been made necessary by the belief that, being within the limits and jurisdiction of the states, they would be embraced by a general phraseology, comprehending all persons within such jurisdiction.

In the 8th section of the same article, it is declared, "the Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the *Indian tribes.*"

It has been contended in the argument, that this clause yields up every right of the states to the United States in relation to the Indians, and the domain they occupy. But where are the words which convey this meaning? The power to regulate commerce with the Indian tribes is relinquished, but what idea does that convey? It is insisted that by this expression it was intended, to give to the general government, and that alone, the power to regulate all *intercourse* with the Indians; I do not understand it

in this way.  Has the Congress the power to regu-
late the whole *intercourse* between the states?  To
prescribe terms upon which the citizens of different
states shall carry on correspondence and every com-
munication with each other; or would this clause,
unrestrained by any other, confer such a power?
No one would answer in the affirmative, and yet the
expression in relation to the commerce of the states,
is as comprehensive as that which respects commerce
with the Indian tribes—the phraseology is identical.

*Commerce* relates to trade; *intercourse* may be
carried on without trade.  Commerce, therefore, in-
cludes no intercourse but that which consists in trade
or traffic; and certainly does not include jurisdic-
tion.  In conferring upon Congress the power "to
regulate commerce with the Indian tribes," even ad-
mitting them to be the tribes within their limits, the
states had no more intention to surrender their sove-
reignty over those tribes, than they had to divest
foreign nations of jurisdiction within their own ter-
ritories by placing in the hands of the federal go-
vernment the power to regulate commerce with them

And not only does a correct construction prove
this, but the conduct of the states since the adoption
of the constitution.  New York, Maine, &c., have
governed the Indian tribes within their limits by their
own laws.  All the tribes living in those States have,
long since, been brought under the action of their
courts; nor has the first man, either in Congress or
out of it, been heard to raise his voice and sound the
alarm, that the constitution of the United States had
been violated.

But it is said, that these tribes are few in number
and surrounded by a white population.

These circumstances, then, terminate a power vested by the constitution, in the United States, without any declaration in that instrument that they shall produce such an effect! Such an argument is too extravagant to need an answer.

I deem it unnecessary to examine the statutes passed by Congress on this subject. Were it admitted that they assume all the power contended for, which it is not; if the constitution does not embrace it, the states retain it, notwithstanding any thing on the United States statute book. It is contended, however, that the grant of the treaty making power by the constitution, and the subsequent treaties which have been made with the Creek Indians by the general government, deprives this state of the jurisdiction which it claims.

By the 10th section of the 1st article of the constitution it is declared, that "no state shall enter into any treaty, alliance, or confederation, &c.," and by the 4th article, that "this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land."

Several treaties made with the Creek nation by the United States, by which the former have ceded considerable districts of country, contain a stipulation, by which the latter guaranty the remainder of their lands to the former.

These treaties, it is urged, form part of the supreme law of the land, as much as the constitution itself, and strip the states of all right to interfere, in any way, with the possessions or internal government of the Indians.

It might be replied that the act extending the jurisdiction of the state over them, in no way violates this guaranty; but under the view I take of the constitution, it is unnecessary to investigate its effect in this respect.

I can not for a moment believe, that it was ever intended, by the framers of the constitution, or the states which ratified it, that compacts within the Indian tribes should be embraced in the above provision: conventions with independent sovereign nations, were alone contemplated. This construction, is, I think, supported by the 2nd section of the 2nd article, which is in these words: "He" (the President) "shall have power by and with the advice and consent of the Senate, to make treaties, provided two thirds of the Senators present concur; and he shall nominate, and, by and with the advice and consent of the Senate, shall appoint ambassadors, other public ministers, and consuls," &c.

Here, to the power to make treaties, is immediately added that of appointing ambassadors: showing that the treaties usually entered into through the agency of regularly accredited ministers, were alone contemplated. Has a minister to an Indian court ever been appointed under this provision of the constitution? Certainly not. The President has, ever since the establishment of our present form of government, authorised such persons as he saw proper, to treat with these nations, without the advice and consent of the Senate. He has on this subject, as well as that of prosecuting war against the savages, acted without consulting either house of Congress. It is true, the practice has prevailed of submitting these *treaties* to the Senate for their ratification, but why

it has been done, unless to secure, more certainly, the necessary appropriations by Congress, it is difficult to say.

The treaty making power is, in Great Britain, a prerogative of the crown. The King appoints ambassadors to foreign courts, and acts upon all treaties made by them, either ratifying or rejecting them, and no treaty is obligatory, as such, until thus ratified. But of all the contracts or treaties, term them as we may, which were ever entered into by the colonies or by agents of the crown, with the Indian tribes, not one, so far as I can learn, was ever thus ratified. They took effect from the time they were concluded between the chiefs of the tribe and the agent, whether he was appointed by the colony or King, and in all respects were conducted as contracts between the monarch and his subjects.

If the constitution had intended to give to negotiations, which had previously been conducted and concluded with so little form and solemnity, all the sanctity and the high character of treaties formed with sovereign states, and to have placed them, not on the footing of other contracts, but that of the constitution itself, by making them, equally with it, the supreme law of the land, surely some plain expression of such intention would have been made use of, and as the power to " regulate commerce with the Indian tribes," was defined in so many words, the high character of treaties with those tribes would have been as plainly expressed.

It seems manifest to me that treaties with the Indians were never intended to be, and are not embraced by by this provision of the constitution; that the history of the intercourse between the crown,

the colonies, the states, and the United States, and the Indians, proves this. The United States, however, are bound by their contracts with these tribes, and can not, either in morality or justice, violate at pleasure, the agreements they have made with them. If they have stipulated any thing they cannot perform, they must satisfy them by a reasonable equivalent. No treaty, however, contains stipulations conflicting with the exercise of jurisdiction by this state. The integrity of their country is guaranteed to the Creek Indians: be it so; this state has no right to the soil in that country either present or prospective. The fee resides in the United States; to the Federal Government, Georgia relinquished it, and in that government it is vested. The power of the United States to continue the Indians in the possession of the country they now occupy in this state, and to remove intruders from among them, I have never denied; but our right of jurisdiction can not be taken from us without impairing our sovereignty.

The constitution of the United States declares that, "no new state shall be formed or erected within the jurisdiction of any other state" without its consent.

I would ask those who contend against our right of jurisdiction, if the effect of their doctrine is not a virtual violation of this provision? If the Indians, as distinct sovereign states, can by treaty or in any other way, be perpetuated among us; if we can not reach them by our statutes; if they can be encouraged to adopt a regular system of laws, a written code for their government: is not a new state formed within this; are not our limits in truth, contracted, by so much as is included in this "new state?"

But it is argued that to many of these treaties, Alabama constitutes a party; that our Senators in Congress have advised and consented to them, and our representatives have taken a part in carrying them into effect; and thereby we have yielded our rights which conflict with their provisions, if such there be.

To this doctrine I can never agree. The people of this state can not be deprived of inalienable rights, by the acts of their representatives in Congress, if they had, in the name of the state, expressly relinquished them. But what is the fact? From the time Alabama has assumed the station of an independent state, a great part of the territory within her limits has been occupied by Indians of different tribes, wretchedly poor in their condition, and excessively indolent in their habits. The great interest of the state, and the object to which she has looked with the deepest solicitude, has been the removal of the Indians, and the opening of the territory occupied by them to a valuable population. Every treaty which has been made, has, in a measure, promoted this important object. It could not be expected, then, that Alabama would object to those treaties. She has always looked forward with confidence to the time, and has expected that it would soon arrive, when the whole state would be freed from its Indian population by the means which were in operation, to the mutual satisfaction of the red and the white man, and has been desirous that, in this way, it might be done. But when the Indians have been reduced to such narrow limits, and arrived to such a condition that a sound policy requires that they shall be embraced by our laws; and when too, indications have

been given by them of a disposition to cede no more of their lands, but to establish themselves as a permanent nation among us; the time has surely come when we should at once, exercise our sovereignty co-extensively with our limits.

I have thus far treated this question as if Alabama were one of the original thirteen States. I have now to examine the last point which was made in the argument against the validity of the statute, viz: that Alabama has relinquished her right to exercise this jurisdiction.

The Union is formed of Independent Sovereign States, which have combined together to secure their own safety, and the happiness of their citizens. In forming this combination, and establishing a Federal Government, nothing has been given up tending to destroy their individual sovereignty. Had this been done, our general government would, not be *federal,* but *consolidated.* It follows from the nature of things, that whenever a new member is added to this family of States, it is received with the same sovereign rights and privileges which belonged to the older members; it does not come in as an inferior, but as an equal; and if any exaction were made of a new State at all inconsistent with its sovereignty, it would be void, because that would be stipulated to be surrendered which is essential to sovereignty; and its being received into the Union as a sovereign State, would avoid any such suicidal stipulation.

On this subject, however, it is only necessary to appeal to the Constitution of the United States, and the different acts of Congress, by virtue of which, Alabama has been admitted into the Union.

By the 3d section of the fourth article of the Con-

stitution of the United States, it is declared, that
" new States may be admitted by Congress into this
Union." If new States are admitted into "this
Union," it must be as the old States have been, that
is, by becoming parties to the compact which bind the
old States together. They must come in under the
Constitution. "This Union," means the Union form-
ed by this instrument or Convention : none can be
received unless upon relinquishing to the federal head
such powers as have been relinquished by the States
which formed the Union, and all shall be secured in
every political right which is secured to the first
members.

In the year 1787, which was before the adoption
of the Constitution of the United States, an ordinance
was passed by Congress " for the government of the
territory of the United States, north west of the river
Ohio." By that ordinance, it was provided that there
should be formed in the said territory not less than
three, nor more than five States" and that such States
" shall be admitted, by their delegates, into the Con-
gress of the United States, *on an equal footing with the
original States, in all respects whatever."*

By the articles of cession which were agreed upon
between the State of Georgia and the United States,
in the year 1802, which was after the adoption of the
Constitution of the United States, by which Georgia
ceded to the United States the whole of the country
now included within the State of Alabama, it is ex-
pressly provided, "that the territory thus ceded,
'shall form a State and be admitted as such into the
'Union, on the same conditions and restrictions, with
'the same privileges, and in the same manner as is
'provided in the ordinance of Congress on the thir-

' teenth of July, 1787," (the one just referred to) " for the government of the western territory of the United States."

In 1819, Congress passed "an act to enable the people of the Alabama Territory to form a Constitution and State government, and for the admission of such State into the Union, *on an equal footing with the original States*." The latter clause of the 1st section declares, that "the said territory when formed into a State, shall be admitted into the Union, upon the same footing with the original States, *in all respects whatever*."

This act defines the boundaries of the new State, which include the district of country occupied by the Creek Indians.

If Alabama is sovereign at all, she is so throughout her whole territory, and she can not be sovereign unless she has the right of jurisdiction. The right of soil she may not have, her citizens may own the whole of that, or the government of the United States may possess the fee in the greater part of it; yet, while this government exercises jurisdiction over it, or has the power to do so, her sovereignty is not impaired; but the moment she loses this power over any part, if it be but a single acre, her sovereign character, as to that part, is lost also.

The Creek country is either within this state, or it is not. The act of Congress for the admission of Alabama into the Union, passed in conformity with the compact with Georgia, in defining the boundaries of the state, includes that country; it then forms a part of Alabama. It is urged, however, that the state might agree *not to exercise* its jurisdiction over a part of its territory, and yet be sovereign, although

bound by this agreement; and that in the ordinance adopted by the convention which formed our state constitution, such an agreement was made.

Waiving an inquiry into the binding effect of such an agreement if made, I can not find that such an one was ever made.

The 6th section of the act of Congress "to enable the people of the territory of Alabama to form a constitution and state government," contains certain propositions for the benefit of the state, which were "offered to the convention of the said territory, when formed, for their free acceptance or rejection." A proviso to that section is in the following words: "that the said convention shall provide, by an ordinance irrevocable without "the consent of the United States, that the people inhabiting the said territory, do agree and declare, that they forever disclaim all right and title to the waste or unappropriated lands lying within the said territory, and that the same shall be and remain at the sole and entire disposition of the United States; and, moreover, that each and every tract of land sold by the United States, after the first day of September, in the year one thousand eight hundred and nineteen, be and remain exempt from any tax laid by the order, or under the authority, of the state, whether for state, county, township, parish, or any other purpose whatever for the term of five years from and after the respective days of the sales thereof: and that the lands belonging to citizens of the United States, residing without the said state, shall never be taxed higher than the lands belonging to persons therein, and that no tax shall be imposed on lands the property of the United States; and that all navigable waters within the said state

shall ever remain public highways, free to the citizens of the said state and of the United States."

An ordinance was adopted by the convention accepting "the propositions offered by the act of Congress."

The act under consideration violates no part of this proviso. The right of the United States to the waste and unappropriated lands in Alabama, is not invaded by the statute, nor is any attempt made to lay a tax on the lands of the United States, nor of non-residents. I do not deny but that such attempts as these would be exceeding the powers of our Legislature, though many eminent men are decidedly of opinion that the Federal Government had no right to require any such terms of us; that they violate the compact with Georgia, the Constitution of the United States, and our inalienable rights, by placing us on an *unequal* footing with the older States, and depriving us of the power of levying taxes on a great portion of the real estate within our jurisdiction; which power, it is contended, is necessary to sovereignty. And in my opinion, although I do not subscribe to this doctrine, it is much more rational than the one which maintains that this State, although sovereign, has no right to exercise jurisdiction over one-third of its territory.

The only other restraining provision to be found in the act of Congress " to enable the people of Alabama Territory, to form a Constitution, &c." is contained in the proviso to the 5th section. " That the same (the Constitution) when formed, shall be Republican, and not repugnant to the principles of the Ordinance between the people and States of the territory north west of the river Ohio, so far as the same has been extended to the said territory, by the articles

of agreement between the United States and the state of Georgia, or of the Constitution of the United States."

The ordinance last referred to contains several "articles of compact" which it declares shall be "unalterable unless by common consent," that is, the consent of the states interested, and the United States. The 3d article, it is alleged, is violated by the statute under consideration. So much of the article as it is necessary to notice, is in these words. "The utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and in their property, rights, and liberty, they never shall be invaded or disturbed, unless in just and lawful wars, authorised by Congress; but laws founded in justice and humanity, shall, from time to time, be made, for preventing wrongs being done to them, and for preserving peace and friendship with them."

The object of this article, is to secure the observance of "the utmost good faith towards the Indians," by the new states: the subsequent clauses only specify the manner in which this "good faith" is to be observed.

1st. "Their lands and property shall never be taken from them without their consent."

The act of our general assembly does not take from the Creek Indians their lands or property. It does not disturb the possession of an individual, but leaves every member of the tribe in the enjoyment of his "lands and property," be they much or little.

2nd. "In their property, rights, and liberty, they shall never be invaded or disturbed."

By the words "rights and liberty," I do not sup-

pose is meant, "rights" claimed by them to the destruction of the rights of the states, nor a "liberty" to do every imaginable act, unrestrained by law. I understand it to be intended that justice shall be secured to them fully and completely, and that their freedom shall be as perfect and unrestrained as that of any citizen in the land.

It is argued, however, that the extension of our laws over them is an invasion of their "rights and liberty," as it necessarily abrogates *their* laws and usages which they prefer, and which they were governed by when our constitution was adopted.

If it was intended by the framers of this article to give them rights as nations, the most unfortunate language has been used for that purpose. They are spoken of as *Indians*, not as *nations*, and the word "liberty" has been employed in a manner which must convince the mind that it is individual liberty which is intended.

The substance of the whole article is, that these people shall be secured by proper laws, and a correct administration of justice, in their persons and property; that on account of their liability, from their ignorance, to be overreached and defrauded by the white man, they shall be protected by suitable laws to be enacted for the purpose. They shall be viewed somewhat as minors, and as wards of the state, receive that degree of care and attention which their situation, and peculiar liability to injury requires.

But the idea that to secure the "rights" of the Indians, the state was to relinquish some of those most important to her, and place herself in something of a state of pupilage to, and dependence upon the savage tribes within her boundary, can not be tolerat-

ed for a moment. We are almost surrounded by these children of the forest; were we to yield all that is claimed for them, in a short time we might, and, I doubt not, would, feel the effects of their " independence." Our citizens might be prohibited by these new sovereigns from carrying on intercourse with several of the neighboring states, except by the one or two path ways which they have agreed with the United States should be open to them ; most intolerable exactions might, even then, be made of them. For offences, either pretended or real, charged to be committed by them while journeying through the dominions of these sovereigns, they might be dragged before their chiefs and other head men, and upon the most crude and unsatisfactory testimony, be consigned to ignominious or fatal punishments.

These and an hundred other causes, would produce a constantly increasing feeling of enmity between the white and red man, especially those who lived near each other, and frequent affrays, riots, and homicides would be the consequence. In fact, a kind of border warfare would always exist between them ; and the only effective way to comply with the injunction of the ordinance, " to prevent wrongs being done to the Indians, and preserve peace and friendship with them," is to bring them under the protection of our laws.

This subject has been much mooted throughout the United States for the last three or four years. In the controversies which have been carried on between the state of Georgia and the Cherokee nation, the feelings of a great proportion of our population has been warmly enlisted in behalf of the latter, and, on

all occasions, my sympathy for the Indians has been great.

I have remembered that, comparatively, but a few years since, they were the undisputed lords of this immense continent; that, unmolested by the white man and ignorant of his existence, they pursued their game through the interminable forests which spread themselves in every direction; that indulging in a freedom unrestrained as the air, they coursed their immense and trackless wilds, changing their situation and country as fancy dictated, or as the powerful inducement of a greater abundance of game operated upon them. But the European has landed upon their coasts! Before his perseverance and industry, the towering forests have fallen; the wild deer have fled from his presence; the Indians too have receded with the game, until their once extensive domains are reduced to small townships, and even there the chase can be pursued no longer, the game has totally disappeared. I look around for their numerous hunters and warriors, they are only to be found in the chronicles of past times; in numbers, the race has rapidly diminished, many of the most powerful tribes are extinct; and the rest seem to be fast tending to the same end; and I feel a deep anxiety that some plan should be devised, to avert this, their too probable destiny.

Such reflections excite a warm interest in behalf of the Indian, and we listen to his complaints fully prepared to believe that he has been injured.

Similar feelings have been general throughout the union, and, doubtless, they have often controlled the intellect, and commanded the judgment, when form-

ing an opinion upon the rights of the states over these rude nations.

But when we contemplate the change which has been wrought in this once savage wilderness, by the arts, the industry, and the superior knowledge of the new population; when we visit our thronged cities, smiling fields, and happy habitations; when we contemplate our numerous bays and harbors, once the resort only of the wild fowl and the inhabitants of the deep; now studded with ships and vessels of all sizes and nations, pouring upon these lands the rich and extensive commerce of a whole world; when, instead of a roving tribe of hunters, we behold a powerful nation of agriculturists, as free in every desirable liberty, as their savage predecessors; when our happy political institutions and the religion of the Bible, have displaced their barbarous laws, and wretched superstitions; can we wish these effects of civilization, religion, and the arts, to disappear, and the dark forests and roaming Indian again to possess the land? Are we not compelled to admit that the superintending providence of that Being who first formed the earth, is to be seen in this mighty change?

Such is my conviction : and much as I may sympathise with the savage, when giving the opinion that the law awards the superiority to his civilized neighbor, I am cheered by the belief that the decision of the law, in this, as in other cases, will be promotive of the best interests of the whole country.

My opinion is, that the judgment should be affirmed.